## SCHWEYER ELECTRIC & MFG. CO. et al. v. REGAN SAFETY DEVICES CO., Inc., et al.

(Circuit Court of Appeals. Second Circuit. January 5, 1925.)

No. 240.

1. Patents ⬳209(1)—Compliance with terms of option by licensee held valid consideration for optional agreement.

Where license agreement between patentee and licensees was deposited in escrow, and by separate agreement licensees were given option to make certain investigations of the inventions, and a limited time within which to declare their intention to make certain tests, defendants' timely notice of intention to make such tests was an acceptance binding on them, and good consideration for option, even though before that time its validity as bilateral agreement was questionable.

2. Patents ⬳209(1)—Test and demonstration provision of optional agreement held conditions precedent to stakeholder's authority to deliver license agreement.

Where license agreement between patentee and licensees was deposited in escrow, and separate optional agreement authorized stakeholder, on compliance with provisions as to test and demonstration, to deliver copies of license agreement to respective parties, in which case license was to be effective, held, performance of conditions as to test and demonstration were conditions precedent, which must be either performed or excused.

3. Patents ⬳209(1) — Patentee by conduct held precluded from objecting that licensees had not performed conditions of test and demonstration.

Where license agreement between patentee and licensees was deposited in escrow, to be effective when licensees had complied with provisions of separate optional agreement requiring certain tests and demonstrations, though licensees' performance of the requirements was not strictly in accord with conditions prescribed, held, that patentee, by expressing satisfaction with result, and not objecting to

tests as made, was precluded from objecting that licensees had not complied with agreement.

**4. Patents ⬤⟹209(1)—Patentee held estopped to urge that equipment used by licensee did not embody "principles" of invention.**

Where license agreement between patentee and licensees was deposited in escrow, to be effective when licensees had complied with provisions of separate optional agreement requiring that principles of patentee's invention be embodied in test equipment, *held*, that patentee, having full information of equipment used in test and full opportunity to inspect same, and having expressed his apparent satisfaction therewith, cannot object that condition was broken, particularly in view of his claim that licensee's equipment infringed his inventions; the word "principles," as applied to the inventions, being those elements which, in combination compose the claims.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Principle.]

**5. Patents ⬤⟹212(1)—Patentee, who attempted to repudiate license and threatened licensees' customers with suits for infringement, will not be heard to object to licensees' failure to use due diligence to exploit inventions.**

Where patentee had repudiated optional contract with licensees, had insisted on reclaiming license, and was threatening licensees' possible customers with suits for infringement, he will not be heard to object that licensees did not use due diligence to exploit inventions.

**6. Contracts ⬤⟹284(4)—Questions of fact between licensee and patentee may be referred to arbitrators, whose award is conclusive.**

Questions of fact, on which the rights of patentee and licensee may turn, may by contract be referred to arbitrators, and their award thereon will be conclusive.

**7. Patents ⬤⟹212(1)—Question of licensees' due diligence in exploiting invention held one of fact, to be determined by arbitration according to agreement.**

Whether licensees used due diligence in exploiting inventions, as required by supplemental option agreement with patentee, is question of fact, as to which requirement of optional agreement for arbitration was binding, and for determination of which parties must proceed as therein required.

Appeal from the District Court of the United States for the Southern District of New York.

Bill in equity by the Schweyer Electric & Manufacturing Company and another against the Regan Safety Devices Company, Inc., and another, in which defendants counterclaim. From a decree directing a stakeholder to deliver to plaintiffs certain documents held in escrow, and dismissing defendants' counterclaim, defendants appeal. Reversed and remanded, with directions.

Richard B. Cavanagh, of New York City (John J. Kirby and Maxwell James, both of New York City, of counsel), for appellants.

Dean, Fairbank, Obriecht & Hirsch, of New York City (Irving H. Obriecht, of New York City, of counsel), for appellees.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge. The plaintiffs were the owners of three patents and one application for an invention touching automatic railway control. On October 3, 1921, they made a contract with the defendants, who were manufacturers of such apparatus, by which on certain conditions the defendants should become exclusive licensees during the life of the patents in question and any improvements made upon the same. This license was attached to the contract duly executed, and two copies of the two documents were delivered to the stakeholder, Davis, to be held by him for delivery in accordance with their terms. The questions arising are whether the contract has been so performed by the defendants as to entitle them to delivery, or whether their rights have been forfeited, so that the plaintiffs may reclaim the documents.

What we have called the contract was in fact only an option and provided in substance as follows: It recited that the defendant Regan Company wished to investigate the plaintiff Schweyer's inventions with a view to acquiring an exclusive license and that the Schweyer Company wished to have the invention commercially exploited by the defendants. Hence the plaintiffs gave the defendants "an exclusive option for 6 months," to begin when the plaintiffs gave the defendants full information as to the inventions, which they must do within 10 days. After receiving the information the defendants were to have 60 days within which to examine the inventions, and must declare their intentions to test them within ten days after those 60 days had expired. If they did so declare, then they must complete "a full-size test or demonstration equipment embodying the principles of the Schweyer induction train control system, with such modifications or improvements as may be deemed by the Regan Company to be desirable, such equipment to comprise two locomotives and five track units or roadway stations." Within a month after the 6 months period had expired, "if the Regan Company shall have performed the covenants contained in section II hereof" (that is, made the

prescribed test and demonstration), "said Regan Company shall have the right to notify Schweyer * * * that the license agreement * * * is in full force and effect" and the stakeholder, Davis, was then to deliver one of the two copies held in escrow to each party; otherwise, the contract to be off.

The defendants did, within 70 days after getting the plaintiffs' information, give notice that they wished to make the test, and proceeded fully to equip one locomotive and partially another for that purpose. The test was made on February 13, 1922, and Schweyer, the patentee, was present by invitation, as the contract gave him the right to be. However, only one locomotive was used, instead of two, and only four "track units," instead of five. Moreover, the question was at issue in the trial whether the equipment used at the time in fact embodied the principles of the "Schweyer induction train control system," though, as we view the case, its disposition is not relevant to a decision of the case.

Schweyer made no question of the failure of the defendants to use two locomotives and five stations, but on the contrary, expressed himself as much pleased with the result of the test to a number of those gathered, whom the defendants had invited to be there. From that time forward nobody indicated any dissatisfaction with the conduct of the defendants until April 12, 1922, when Schweyer advised Davis, the stakeholder, that they had not performed, and that the option was off. Within the prescribed time the defendants, ignoring this attempt to terminate the contract, advised Davis, as required, that they elected to accept the license agreement. Each party demanding the documents, Davis, thus between two fires, declined to deliver to either, and after some fruitless negotiation this bill was filed a year and a half later, in December, 1923. The defendants filed a counterclaim with its answer, demanding delivery to themselves. The learned District Judge dismissed the counterclaim and gave a decree on the bill.

After the test, but on the same day, Schweyer had an interview with Harwig, one of the defendant's designers, who understood the apparatus actually installed on the locomotive. Together they saw the locomotive which had been used, made rough drawings for each other's enlightenment of the electrical equipment, and discussed its details. Schweyer raised no objection to what he learned, and asked for no information which he did not get, though he did suggest certain changes to make the apparatus more acceptable. During the months of February and March the parties corresponded freely about getting into proper form the application mentioned in the license, which the defendants wished to include within it. Still the plaintiffs raised no question of the insufficiency of the test in any aspect, but made suggestions as to the application, submitted drawings, and urged an early submission of it to their attorney. In the same period they opened negotiations toward a similar license upon their Canadian patents for the same apparatus.

The bill lays three causes of suit, the first being for infringement of the three patents mentioned in the license agreement. The acts of infringement are the manufacture of apparatus similar, though not identical, with that used in the test. As was necessary, the bill charges the infringements to be what the defendants were making, including the apparatus used at the test. At least, if this be not clear, Schweyer himself says that this apparatus infringed his claim.

[1, 2] Coming, now, to the parties' rights, there might indeed be a question of the validity of the "option" as a bilateral contract before the defendants gave notice within 70 days that they wished to make the test, but that at any rate was an acceptance, and they became thereupon bound to make it, obviously a good consideration. Thereafter the only question which could arise was whether they had performed the condition expressly attached in section III of the contract to the covenant that Davis should deliver. We quite agree with the learned District Judge that this was in every sense a condition precedent, which must be performed or excused. For the purposes of argument, and without expressing any opinion either way, we shall assume as well that there was no room for the application of the doctrine of "substantial performance."

[3] Where we do differ with the learned judge is in his conclusion that the defendants' excuses for their failure to perform the condition precedent were not good. That the plaintiffs may have an action for breach of the covenant to make the test as laid down in section II of the contract may well be true; we say nothing as to it. But it has been very long settled law that conduct may excuse performance of a condition which does not release the promisee, if he has also promised to perform the condition itself. This case only raises the question of excuse, and particularly that excuse which goes by the vague name of "waiver."

The facts show beyond doubt that Schweyer expressed himself as altogether content with the test. He now challenges it in two particulars: First, because the equipment was of only one locomotive and four stations; and, second, because it did not embody his "principles." As to the first, it is plain that his apparent acquiescence could have had but one meaning to any ordinary person, however Schweyer may have privately regarded it. It meant that he thought the test a compliance with the condition. Moreover, his immediate conference with Harwig again presupposed that it had been satisfactory, as did the correspondence to which we have just referred. All this could have been understood only as a promise on his part to accept the test as sufficient.

There are, indeed, difficulties in theory in treating such promises as effective to relieve the promisee of a condition, since in effect they substitute a new promise for the old without consideration. Yet courts have supported them for over a century, and they are as much a part of the law of contracts as anything else. They are discussed with his customary clarity by Mr. Williston (Williston on Contracts, § 693), and the books bear out his text (Swain v. Seamens, 9 Wall. 254, 19 L. Ed. 554; Clark v. West, 193 N. Y. 349, 86 N. E. 1; Frankfurt-Barnett Co. v. Prym Co., 237 F. 21, 150 C. C. A. 223, L. R. A. 1918A, 602 [C. C. A. 2]; Boston Blower Co. v. Brown, 149 Mass. 421, 426, 427, 21 N. E. 883; Boyden v. Hill, 198 Mass. 477, 85 N. E. 413).

[4] As to the embodiment of the "principles" of Schweyer's control in the test equipment, the case is somewhat different. The meaning of the word used is not altogether clear, and it was expressly agreed that the defendants might make modifications of its own in the testing equipment. However, not only in the bill, but upon the stand, Schweyer insisted that his claims were infringed, and it is hard to see what better meaning can be assigned to the "principles" of patented inventions than those elements which in combination compose the claims. Since these alone can be protected from use by every one, they are the only parts of the disclosure which could well have been within the contemplation of the parties in any license agreement. Hence it seems to us that on the plaintiff's own admissions the test in this respect conformed with the contract.

However, we need not stop there. The same considerations which excused the defendants' conceded breach as respects the size of the equipment excuse it as well, though the "principles" of the inventions were not embodied in the test; because, while the evidence does not so clearly show that Schweyer knew just what apparatus was used, he was given every opportunity to learn. The locomotive was there, and Harwig had had instructions to give him all the information which he wanted. They discussed the equipment together as experts in such questions, and Schweyer left, apparently contented. Were there any evidence of any suppression of the facts by the defendants, or of any overreaching, the situation would, of course, have been quite different; but, since we must assume that the defendants thought they had complied with the contract, and since they offered the plaintiffs full opportunity to inspect, there could be but one conclusion from their silence and apparent satisfaction.

We do not mean to say that Schweyer might not have changed his position and withdrawn his promise, had he acted in season. The promisee's inaction or subsequent conduct on the faith of the promise can hardly be treated as an acceptance. The acquiescence of the promisor should indeed be treated as though he said, "I will perform in spite of your failure to comply exactly with the condition;" but it would be a strain on the fair meaning of the situation to construe the promisee's reliance on that promise as an acceptance or the promise as contemplating any acceptance at all. Besides, all this would not obviate the difficulties attendant upon finding any proper consideration.

The question is rather akin to an estoppel, though it is not ordinarily even that, because the promisor usually honestly means to excuse performance. Yet it is like an estoppel in this: That the promisee must have so far relied upon the promise that, if it be later withdrawn, his position has been changed in such a way that he cannot fairly be asked then to comply with the condition.

So, in the case at bar, Schweyer went on until the period had expired within which the defendants could make a test in accordance with the contract. Then and there alone Schweyer pounced upon them with a repudiation. That, on every principle of fair dealing, he might not do; indeed, it is little difficult to see, in view of his private interviews with his lawyers, how he could have meant to treat them fairly at all. But that makes no difference, for it is possible that he quite honestly misapprehended the situation. The important thing is that, when he did protest, it was too late for them to remedy the defects, and that he meant it to be too late. That the law will not tolerate. Hence

we hold that the defendants were excused from compliance with the conditions and are entitled to the license.

[5] There remains the question of whether the defendants did not, as required in the license, use "due diligence" to exploit the inventions. As to this the obligation plainly began only after the license went into effect, which, as we hold, was at the time of the defendants' election to accept it, April 24, 1922; but at that time the plaintiffs had already repudiated the contract, were reclaiming the license, and shortly thereafter threatening the defendants' possible customers with suits for infringement. The plaintiffs cannot complain that in such a posture the defendants should not push the inventions to the utmost, though so far as can be ascertained from this record they seem to have done so.

[6, 7] However, the whole issue is in any case irrelevant, because section III of the license provided for arbitration of the question of due diligence, with which the plaintiffs made no effort to conform. While there has, as we all know, been much controversy as to the validity of a general arbitration agreement which removes all the parties' rights from the courts, courts have uniformly held that a question of fact on which those rights may turn may be referred to arbitrators, and their award will be conclusive. Hamilton v. Liverpool, etc., Co., 136 U. S. 242, 10 S. Ct. 945, 34 L. Ed. 419. "Due diligence" in exploiting the plaintiffs' invention was such a question, in spite of the fact that it required standards of conduct which cannot be objectively determined in advance. At most, under this section, the defendants were to lose their exclusive license, and it was only after four years that they should cease to have any license whatever. Plainly the defendants are entitled to the license agreement, and the plaintiffs, if they question the sufficiency of their efforts, must proceed under the license itself.

It results that the decree must be reversed, and the cause remanded, with directions to grant a decree directing the stakeholder, Davis, to deliver a copy of the documents to each of the parties, in accordance with section III of the contract. We see no occasion for any injunction against the plaintiffs' making claims to ownership of the patents. As to the remainder of the bill, while this decision renders it impossible of success, we do not have it before us, and therefore make no disposition in respect of it. The appellants will have costs in both courts.