AMERICAN SURETY COMPANY OF NEW YORK, Appellant, *v.* PHILIPPINE NATIONAL BANK, Respondent.

**Banks and banking — guaranty — ultra vires — open and running accounts — payments thereon payments in fact and not affected by new loans — mere giving of guaranty not beyond corporate powers of bank unless specifically prohibited by its charter — defense of ultra vires not available to bank in action on its guaranty given in order to procure bond — bank cannot repudiate transaction induced by its representation that it was beneficially interested.**

1. All business transactions and all relations between debtor and creditor need not be stopped in order to make payments received on open and running accounts payments in fact. The continuance of business either by loaning more money or selling more goods does not take from previous payments their nature as real payments. The money thereafter loaned is the creditor's money, and not the mere handing back to the debtor of his payment. Every credit is a new transaction the same as every sale is a new transaction.

2. The mere giving of a guaranty or of an undertaking is not in and of itself a wrong, illegal, or beyond the corporate powers of a bank not specifically prohibited by its charter from giving any kind of a bond or undertaking. It depends upon the nature of the transaction and the bank's interest in the property.

3. Where a customer of defendant bank, in order to vacate an attachment against a shipment of goods, deposited with the sheriff a large sum of money, and, thereafter, the bank, to which its customer was largely indebted on daily balances, applied to plaintiff, surety

company, for a bond to release the money, which the latter refused to issue unless the bank would join in guaranteeing it against any loss arising therefrom; whereupon the bank, through its officers, made written application for the bond, agreeing therein that it would indemnify and save the surety harmless from any loss and representing that it was specially and beneficially interested in obtaining the money deposited with the sheriff, and the surety issued its bond accordingly, thereby releasing the money which was transmitted to the bank and passed to the credit of its customer, reducing by so much the customer's indebtedness; in a subsequent action by the surety company against the bank to recover on the guaranty the amount of a judgment it had been compelled to pay by reason of its bond, the bank cannot defend upon any theory of *ultra vires.* Having represented that it was interested in procuring the money of its customer and induced the plaintiff to act on that representation, whereby it procured the money, the bank cannot repudiate the transaction. (*Gause* v. *Commonwealth Trust Co.,* 196 N. Y. 134, distinguished.)

*American Surety Co.* v. *Philippine Nat. Bank,* 217 App. Div. 732, reversed.

(Argued April 6, 1927; decided May 3, 1927.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered June 24, 1926, unanimously affirming a judgment in favor of defendant entered upon a verdict directed by the court.

*Frank C. Laughlin, Joseph W. Kirkpatrick* and *Henry C. Willcox* for appellant. The plaintiff is entitled to recover from the defendant under the terms of the indemnity agreement, for there is no proof that the defendant did not have power to enter into this agreement with the plaintiff, and the presumption is that the contract is not *ultra vires.* (*Jacobs* v. *Monaton R. I. Corp.,* 212 N. Y. 48; *Gordon Malting Co.* v. *Bartels Brewing Co.,* 206 N. Y. 528; *Patterson* v. *Robinson,* 116 N. Y. 193; *Rider Life Raft Co.* v. *Roach,* 97 N. Y. 378; *Chautauqua County Bank* v. *Risley,* 19 N. Y. 369; *Nelson* v. *Eaton,* 26 N. Y. 410; *Gaul* v. *Kiel & Arthe Co.,* 199 N. Y. 472; *Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159.) Even if it be assumed

that the indemnity contract is *ultra vires* still the plaintiff is entitled to recover from the defendant the amount of its loss. (*Bath Gas Light Co.* v. *Claffy*, 151 N. Y. 24; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Bissell* v. *Michigan Southern Ry.*, 22 N. Y. 258; *Central Transportation Co.* v. *Pullman Co.*, 139 U. S. 24; *Logan County Bank* v. *Townsend*, 139 U. S. 67; *First Nat. Bank of Aiken* v: *Mott Iron Works*, 258 U. S. 240; *Ellis* v. *Citizens' Nat. Bank*, 25 N. M. 319; *U. S. Fidelity & Guaranty Co.* v. *First State Bank*, 116 Miss. 239; *Southworth* v. *Morgan*, 205 N. Y. 293; *Strodl* v. *Farish-Stafford Co.*, 145 App. Div. 406.) The defendant benefited by its agreement of indemnity and the bond discharging the attachment to the extent of $127,000. (*Matter of Holmes*, 37 App. Div. 15; 159 N. Y. 532; *Blair* v. *Hill*, 50 App. Div. 33; 165 N. Y. 672; *Portuguese Fraternity* v. *Liberty Trust Co.*, 215 Mass. 27; *Newport* v. *Hatton*, 195 Cal. 132; *Pollack* v. *Leonard & Brainiff*, 112 Okla. 276; *Pearce* v. *Dill*, 149 Ind. 136; *Appleton* v. *Citizens' Central Nat. Bank of New York*, 190 N. Y. 417; *Marks* v. *Kellogg*, 170 App. Div. 464; 220 N. Y. 615; *Leask* v. *Hoagland*, 205 N. Y. 171; *Koehler* v. *Adler*, 78 N. Y. 287; *Matter of Baldwin*, 11 App. Div. 551; *Poucher* v. *Scott*, 33 Hun, 223.)

*John W. Hannon* and *John T. Loughran* for respondent. The alleged indemnity agreement was in fact not the act of defendant bank. (*People's Bank* v. *St. Anthony's R. C. Church*, 109 N. Y. 512; *Wilson* v. *Kings Co. E. R. R. Co.*, 114 N. Y. 487; *Jacobus* v. *Jamestown Mantel Co.*, 211 N. Y. 154; *Quackenboss* v. *Globe & R. F. Ins. Co.*, 177 N. Y. 71; *Gause* v. *Commonwealth Trust Co.*, 124 App. Div. 438; 196 N. Y. 134.) The alleged indemnity agreement was *ultra vires* defendant bank. (*Nassau Bank* v. *Jones*, 95 N. Y. 115; *Nat. Park Bank* v. *G. A. M. W. & S. Co.*, 116 N. Y. 281; *Jemison* v. *Citizens' Savings Bank*, 122 N. Y. 135; *Gause* v. *Commonwealth Trust Co.*, 196

N. Y. 134; *Jacobs* v. *Monaton R. I. Corp.*, 212 N. Y. 48; *Gordon Malting Co.* v. *Bartels Brewing Co.*, 206 N. Y. 528; *Patterson* v. *Robinson*, 116 N. Y. 193; *Rider Life Raft Co.* v. *Roach,* 97 N. Y. 378; *Chautauqua County Bank* v. *Risley*, 19 N. Y. 369; *Yerkes* v. *Nat. Bank of Port Jervis*, 69 N. Y. 382.)

CRANE, J.   The defendant, Philippine National Bank, is a foreign banking corporation duly created and existing under an act of the Legislature of the government of the Philippine Islands.

The Philippine Vegetable Oil Co., Inc., was a foreign corporation, duly organized under the laws of the Philippine Islands, having its principal office at Manila, and a branch office in the city of New York, in charge of one Herbert Hellis as its general manager.   The business of the corporation was trading in, and exporting vegetable oils to the United States and elsewhere.   The company had a plant in San Francisco, Tacoma and New York; it had its own ships and tank cars and tank receiving stations, and did a banking business not only with the defendant, but with the Hong-Kong and Shanghai Banking Corporation, the Chartered Bank of India, Australia and China, and the International Bank, and the Bank of the Philippine Islands.   It was one of the defendant's largest customers, transacting business with it in two ways: on its exports, it cashed drafts at the defendant bank, turning over to it the bill of lading which the defendant in turn transferred to the consignee when the drafts were paid; the other way of doing business was to borrow money from the defendant by overdrawing its account.   It had the privilege, or was given credit by the defendant to overdraw its account up to about 1,000,000 pesos, or $500,000.   This was a running account in which deposits were made nearly every day, and credited to the oil company, and moneys drawn out daily generally in excess of the deposits.   Interest was

charged on the daily balances, which were always in favor of the bank.   In other words, during the times here in question, the oil company was always in debt to the bank, having continually exercised the privilege of over-drawing its account.   Its credit was kept good by the daily payments on account; that is, by the deposits made to its credit.   The bank was loaning its money to the oil company in this way, receiving every day pay-ments on the loan, or deposits, which kept down the total of the indebtedness to somewhere within the limit of the oral arrangement.   While the moneys advanced by the bank amounted to millions, the payment and deposits made by the oil company kept the balance of the debt, or advance, to $500,000, or thereabouts.   The bank kept but one account with the oil company, and this was the account, copies of which were received in evidence, showing the moneys drawn out by the oil company, the moneys deposited, and the daily and monthly balance.   The account is in the form of a debit and credit account, so that the balance due can be ascertained for any one day.   On June 30, 1918, the debt due the defendant was 751,612 pesos; on July 31 it was 752,189 pesos; on August 5, 1918, the oil company had overdrawn to the extent of 1,107,746.37 pesos, or $553,873.18.   As shown by the books, the balance on July 31 was the figure above given, 752,189.63 pesos; on the next day, August 1, the oil company had drawn out five separate items aggregating 533,362.04 pesos, and had deposited 227,849.78 pesos.   On August 2 it drew out 30,000 pesos, and deposited 1,409.02 pesos.   On August 3 it drew out four items aggregating 206,585.54 pesos, and deposited two items, 186,221.78 pesos.   On August 5 it drew out 99,009.90 pesos, and deposited four items aggregating 351,920.16 pesos, one of which items was a deposit of 254,000 pesos.   This item we must bear in mind, as it is all important to this case.   Thus we see that the daily balance of the depositor continually fluctu-

ated.  Its credit necessarily depended upon its payments. It was always in debt, but kept the balance of its debt down by making daily· payments, as above indicated. It drew out and paid back, the bank receiving as above stated, the interest on the daily balance.  If the debtor, the oil company, had paid the balance due in full, the amount would have been entered as a credit, balancing the account the same as was entered this item of 254,000 pesos.  Every deposit, therefore, to the account of the oil company was a reduction of its debt; money received by the bank in part payment of the balance due.  Delaney, the bank's manager in Manila, testified that all the deposits operated to reduce the oil company's indebtedness and· the daily interest charges.  This item of 254,000 pesos he said was applied by the bank no differently than any other item of deposit.  At no time was the bank obliged to loan the oil company any more money. The overdrafts were an extension of credit voluntarily given.

On the fifth day of August, as the above account shows, and as I have stated, the oil company owed the bank 1,107,746.37 pesos, or $553,873.18.  On that day it received, with other deposits, this item of 254,000 pesos, or $127,000.  If the bank had shut down the loan account on that day, and stopped further credit, the balance due would have been reduced by this amount deposited.  The fact is that on that day the bank only loaned out to the defendant 99,009 pesos, or $45,500.  As the interest stopped on the $127,000, or on the balance deposited over and above the amount paid out this day, the deposit must have been considered a payment.  However we look at this account, all the deposits made by the oil company were in part payment of its debt, and applied by the bank on the indebtedness.

This amount of 254,000 pesos, or $127,000, deposited to the credit of the oil company on August 5, 1918, was money received by the bank from the oil company, and

applied by it, as I have just stated, to the oil company's indebtedness. It received this money in the same way in which it would have received the entire balance due, if it were to close out the account. Such a final payment would have been credited in the same way. Therefore, this deposit was received by the bank and credited as payment on its debit and credit account in the same way as any other creditor would receive payment for money loaned or goods sold and delivered on an open and running account. People do not have to stop all business transactions and end all relations in order to make payments received on open and running accounts payments in fact. The continuance of business either by loaning more money or selling more goods does not take from previous payments their nature as real payments. The money thereafter loaned is the creditor's money, and not the mere handing back to the debtor of his payment. The credit is the thing, and this is kept alive by payments in whole or in part. Every credit, however, is a new transaction the same as every sale is a new transaction.

This rather lengthy, and perhaps unnecessary, explanation of the relationship between the Philippine National Bank and the Philippine Vegetable Oil Co., Inc., is due to the view which the bank has presented through counsel and counsel only, regarding this payment of 254,000 pesos, or $127,000, on August 5, 1918. As this case centers around this deposit, it is necessary to understand the facts and circumstances which enabled the bank to get it.

Prior to July 27, 1917, a cargo of vegetable oil had been shipped by the Philippine Vegetable Oil Co., Inc., to New York city and was there attached by virtue of a writ of attachment in an action in the Supreme Court, New York county, brought by Fels & Co. against the oil company. Thereafter, the oil company, in order to release the oil and vacate the attachment, deposited with the sheriff of Richmond county the sum of $127,000,

which remained in his hands until the giving of the undertaking hereinafter mentioned. In June and July of 1918 the oil company had heavily overdrawn its account with the Philippine National Bank. Whether the deposits were not coming in fast enough to suit the bank we do not know, as the officers of the bank have kept silent upon this matter. However, we do know that the oil company, or the bank, or both of them, wanted this cash deposit lying idle with the sheriff of Richmond county. The first one to propose getting it was the Philippine National Bank. In June of 1918 it communicated with the plaintiff, the American Surety Company of New York, a bonding company, and attempted to get that company to give a bond to the sheriff of Richmond county in place of the money. Naturally, the bonding company wanted security for such an undertaking, and the defendant bank offered the bond of the Philippine Vegetable Oil Co., Inc. This the American Surety Company refused to take, but stated that it would accept the undertaking or guaranty of the oil company and the Philippine National Bank. C. C. Robinson was vice-president of the bank and general manager of its New York city branch. He was the one who started and finished all negotiations with the American Surety Company. The transactions were with the bank through Robinson, and not with the surety company. Robinson stated that the bank had loaned the Philippine Vegetable Oil Co., Inc., $1,400,000, and thought very well of the company. However, he could not furnish the security required without communicating with the home office at Manila. Thereupon, he cabled to the defendant, the Philippine National Bank, at its home office, for instructions, in the following words:

" Relative Fels Bond, unable obtain without our guaranty shall we do this.

" PHILIPPINE NATIONAL BANK,

" New York Agency."

Unless the bank was interested in procuring this Fels money, so called, of $127,000, it is impossible to understand why the agent in New York should notify the home office that it, the New York branch, was unable to obtain the money. It is quite apparent that for some reason the bank wanted this money, as fully indicated in its reply, which came by cable, July 15:

" Provide Guaranty for Fels Bond have Hellis remit fund here when received.

              " PHILIPPINE NATIONAL BANK,
                               " Manila
" (Signed)   Delaney, *Vice Pres. & Gen'l. Man.*"

Hellis was an officer and manager of the oil company. The money, when received after the giving of the guaranty, was to be remitted to Manila, as was done in full compliance with these instructions from the home bank.

After receiving this authority from Manila, Robinson, as an officer of the bank, made an application in writing to the American Surety Company for a court bond to discharge the attachment and get the $127,000; that is, made application to the surety company to have it give a bond to the sheriff of Richmond county in place of the money. The bank, in this written application, agreed that it would at all times indemnify and save the surety harmless from and against every claim, demand, liability, cost, charge, counsel fee, expense, suit, order, judgment and adjudication whatsoever, and also stated that this suretyship or bond to be given by the surety company was for the special benefit of the bank, its property and income. The bank's statement was further set forth in these words: " and the indemnitor (the bank) represents that it is specially and beneficially interested therein." This application was executed by the Philippine National Bank, New York agency, by C. C. Robinson, agent, and acknowledged by him on the 17th day of July, 1918. The truth of these representations has never been denied.

The application was also signed and executed by the Philippine Vegetable Oil Co., Inc., by Herbert Hellis, local manager.

Relying upon these cablegrams, which were shown to the officers of the American Surety Company, and this written application with its representations and undertakings, the American Surety Company gave the bond required; the sheriff released the $127,000 cash, paid it to Hellis of the Philippine Vegetable Oil Co., Inc., who in turn paid it over by check to the Philippine National Bank, New York branch. The check was made payable to the Philippine National Bank. Thereupon, the money was cabled to the home bank in Manila, according to the instruction which had been received, and was passed to the credit of the Philippine Vegetable Oil Company's account on August 5, 1918, as the 254,000 pesos above mentioned. In all the communications the money was referred to as the $127,000 from the Fels attachment. On the day in which the deposit was made with the home bank at Manila, and credited in the books as above shown, that bank delivered to the Philippine Vegetable Oil Co., its debtor, at Manila, the following memorandum:

" PHILIPPINE NATIONAL BANK,
" Manila, P. I.
" Official Depository of the Philippine Government
" *August 5th,* 1918.
" PHILIPPINE VEGETABLE OIL CO.,
" Manila, P. I.:
" We — CREDIT — Your Account P 254,000.00 Being amount released by bond in Fels case, per cable instructions of our New York Agency dated August 3rd."

Some years later, in the Fels action, a judgment was recovered which the American Surety Company was obliged to pay. This action has been commenced against the Philippine National Bank upon its guaranty or undertaking to recover the amount of this payment with

counsel fees and expenses. The bank has repudiated its acts under the plea of *ultra vires*, and has so far succeeded.

The motion to dismiss and for a direction of a verdict for the defendant was made solely on the ground that the guaranty or written undertaking given to the American Surety Company was beyond the corporate powers of the bank, and invalid for this reason. The motion was granted by the court solely on the ground that it was a case of *ultra vires*. The decision and authority of C. C. Robinson, as vice-president and general manager of the defendant in New York city, was conceded. Jason E. Delaney, the vice-president and general manager of the defendant bank in Manila, Philippine Islands, gave the authority in behalf of the bank to Robinson to execute the agreement with the American Surety Company. His position with the bank and the fact that he gave such authority is conceded. Delaney appeared and testified at the trial. His authority to act for the bank in this particular was not questioned. He did not deny having such authority to act for the bank. If a resolution of the board of directors were necessary to give him authority in such a case, the defendant could easily have proved that no such resolution was ever passed or action taken. The defendant not only failed to prove such omission, but never questioned Delaney regarding his authority to send the cablegram to Robinson. However, resolutions of boards of directors for daily transactions in large banking houses are not usual or expected. Officers conduct the business of making loans and procuring payments without direct authority for every transaction. Besides, the bank having received the money as the result of this promise made to the plaintiff, cannot deny the authority of its officers in the matter. They are presumed to have acted with authority until the contrary appears. (*Oakes* v. *Cattaraugus Water Co.*, 143 N. Y. 430, 436; *Nelson* v. *Eaton*, 26 N. Y. 410; *Hess* v. *Sloane*, 66 App. Div. 522; affd., on opinion below, 173 N. Y.

616; *Seymour* v. *Spring Forest Cemetery Assn.,* 144 N. Y. 333, 341; *Black River Ins. Co.* v. *New York State Loan & Trust Co.,* 73 N. Y. 282; *Lumber Co.* v. *Telephone Co.,* 127 Iowa, 350, 355; *Hastings* v. *Brooklyn Life Ins. Co.,* 138 N. Y. 473, 479.).

The defendant rested its motion for the direction of a verdict entirely upon the powers of the bank appearing from its charter, the act of incorporation. This gave it power to make contracts and to carry on the banking business and to further exercise the general powers given by the corporation law of the Philippine Islands, so far as not inconsistent with the act of incorporation. This was not a National bank of the United States government, whose powers are defined by Federal law. It is a bank created by a law of the Philippine Islands, a foreign State. To know what powers were given by the corporation law referred to in the charter, it was necessary for the defendant to prove the law. This it did not do. We have not been informed what the banking business is as carried on under the law of the Philippine Islands. This also the defendant failed to prove. We cannot assume that the banking business of to-day is the same as it was a decade ago, or that the banking business is limited in all jurisdictions alike. We know how the Federal banking system of this country has increased its powers and undertaken enterprises heretofore prohibited. (*People ex rel. Pratt* v. *Goldfogle,* 242 N. Y. 277; *State of Minnesota* v. *First National Bank of St. Paul,* 273 U. S. 561.) The charter of this Philippine bank gave it very wide scope of activity. How can we say that the banking business in Manila or in Hong-Kong is conducted in the same way as in New York State? There is some intimation in the brief of the appellant, supported by authority, that the law of the Philippine Islands, being part of the civil law, does not recognize the doctrine of *ultra vires.*

However this may be, we shall not consider these

points, as the defendant, in our opinion, cannot defend the plaintiff's claim upon any theory of *ultra vires* applicable in this or in any other State. In *Appleton* v. *Citizens' Central Nat. Bank* (190 N. Y. 417) Chief Judge Cullen said: " Whatever the difference of view there may be as to the effect of *ultra vires* on corporate contracts, in no jurisdiction can a party retain what it has received under such a contract and refuse to perform the contract."

In that case a National bank, in order to obtain a payment on a loan which it had made, guaranteed the loan of a larger amount made by another bank to the debtor, out of which money the debt due the guaranteeing bank was to be paid. When sued on its guaranty, it pleaded *ultra vires*, and this court said:

" We may assume that the contract was *ultra vires*. We may further assume that in transactions by national banks we should adopt the law of *ultra vires* as it prevails in the Federal courts, and not the local law on the subject. Yet the defendant, in our opinion, became plainly liable for the amount which it received under the *ultra vires* contract. The law which obtains in this State and in several other jurisdictions is that where one party has received the full benefit of an *ultra vires* contract it cannot plead the invalidity of the contract to defeat an action upon it by the other party."

The United States Supreme Court affirmed this decision (*Citizens' Central Nat. Bank* v. *Appleton*, 216 U. S. 196).

Chief Judge Andrews, writing in *Bath Gas Light Co.* v. *Claffy* (151 N. Y. 24), reviewed the law upon this subject of *ultra vires*, and said:

" The modern and reasonable doctrine that contracts into which corporations may lawfully enter are such only as are expressly or impliedly authorized by their charters, is nevertheless frequently disregarded in practice, and when this is done and a corporation enters into a contract beyond its chartered powers, the question arises which has been the subject of debate and of much difference of

opinion, how shall such a contract be treated by the courts, and whether the contract can create any rights as between the parties which the courts will enforce."

And speaking for this court, he then declared, after citing numerous authorities: " Public policy is promoted by the discouragement of fraud and the maintenance of the obligation of contracts. * * * The courts in this State from an early day, commencing as far back as the *Utica Insurance* cases, have sought to regulate and restrict the defense of *ultra vires* so as to make it consistent with the obligations of justice."

And going back to *Whitney Arms Co.* v. *Barlow* (63 N. Y. 62), Judge Allen, writing for the court, said: " The plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong."

The same view has been taken of this doctrine by the United States Supreme Court in *Railway Co.* v. *McCarthy* (96 U. S. 258, 267), which it expressed in these words:

" When a contract is not on its face necessarily beyond the scope of the power of the corporation by which it was made, it will, in the absence of proof to the contrary, be presumed to be valid. Corporations are presumed to contract within their powers. The doctrine of *ultra vires* when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice or work a legal wrong."

Applying this rule to a National bank, the United States Supreme Court decided that it could not hold on to securities and at the same time refuse to comply with an *ultra vires* agreement. (*Logan County Nat. Bank* v. *Townsend*, 139 U. S. 67.)

The method adopted by the United States courts for carrying out these views is expressed in *Central Transportation Co.* v. *Pullman's Car Co.* (139 U. S. 24, 60):

9

"A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it." (See, also, *People's Bank* v. *National Bank*, 101 U. S. 181, 183; *Rankin, Receiver of Berlin National Bank*, v. *Emigh*, 218 U. S. 27; *Seeber* v. *Commercial Nat. Bank of Ogden*, 77 Fed. Rep. 957.)

One of the latest cases is that of *First National Bank of Aiken* v. *Mott Iron Works* (258 U. S. 240), wherein Mr. Justice HOLMES tersely holds the bank liable on a written guaranty of a contract for goods sold and delivered to third parties assuming apparently that the law has been well settled that a bank cannot hold proceeds arising from such a contract and plead illegality. He states: "The bank is in the position of having realized the benefit to acquire which the guaranty was made, and of having realized it out of the proceeds of the goods that it induced the Iron Company to sell."

He also refers to the distinction between holding the bank on its guaranty and recovering for the benefits received as purely formal.

With these authorities confronting us, what shall we say about this case? The bank was not specifically prohibited by its charter from giving any kind of a bond or undertaking. I take it that if in the course of its banking business it were necessary to bring suit to recover moneys loaned, it could give the security required by any particular forum or the undertakings necessary for attachment process. In my opinion, it might also in a proper case give a bond or undertaking to obtain cash or property as part payment on account of an indebtedness

agreeing therein to return the cash or the property if it should subsequently be determined that the bank was not entitled to it. (*Holmes & Griggs Mfg. Co.* v. *Holmes & Wessell Metal Co.*, 127 N. Y. 252, 257.) The mere giving of a guaranty or of an undertaking is not in and of itself a wrong, illegal, or beyond the corporate powers of a bank. It all depends upon the nature of the transaction, and the bank's interest in the property. The contract with the plaintiff on its face was not necessarily beyond the scope of the power of the bank. (*Railway Co.* v. *McCarthy, supra.*) The bank stated in its agreement with the American Surety Company that it was interested in obtaining the $127,000 deposited with the sheriff of Richmond county. It said that it had a special benefit in the property. To use its words: " The indemnitor represents that it is specially and beneficially interested therein." This has never been denied by the defendant. The officers of the bank were called on the trial of this case and did not deny this statement. Who would know better of the interest of the bank in obtaining this money than its vice-president and general manager who authorized the giving of this undertaking to the plaintiff? He does not say that the statement of interest is false; neither does he deny that the bank was interested in obtaining the money. The record is barren of any explanation for such a carefully prepared and deliberate statement. On the strength of this statement and of the written guaranty or promise to make good any liability, the plaintiff surety company gave its bond to the sheriff and released the $127,000 which immediately went to the defendant bank in Manila by its own order and direction, and was credited on a debt owed to it by the Philippine Vegetable Oil Co., Inc. How this was done I have explained at the beginning of this opinion. Personally, I do not consider the transaction *ultra vires*, nor do I think that the defendant has proved the transaction *to* be without the scope of the defendant's banking powers.

However, the bank cannot represent that it is interested in obtaining money, and then having induced the plaintiff to act on that representation and having thereby procured the money, repudiate the transaction.

*Gause* v. *Commonwealth Trust Co.* (196 N. Y. 134), much relied upon by the respondent, related to an agreement from which the trust company received no benefit, as was stated in the opinion.

For the reasons here stated, the judgment of the Appellate Division and that of the Trial Term should be reversed. In response to a question put by the trial court both counsel conceded that there was no question of fact to be submitted to the jury; that the only question was that of corporate power under the bank's charter. As we have determined this question against the defendant, judgment should be directed in favor of the plaintiff for the relief demanded in the complaint, with costs in all courts.

LEHMAN, J. (dissenting). The defendant was incorporated by special act of the Philippine Legislature. Its charter provides that it shall have power:

" (a) to prescribe its by-laws.

" (b) to adopt and use a seal.

" (c) to make contracts.

" (d) to sue and be sued.

" (e) to exercise the powers granted in this Act and such incidental powers as may be necessary to carry out the business of banking, within the limitations prescribed by this Act, and

" (f) to exercise further the general powers mentioned in the Corporation Law so far as they are not inconsistent with or incompatible with the provisions of this Act."

The defendant may " carry out the business of banking," but only " within the limitations prescribed by this Act." We are not relegated for definition of what constitutes the " business of banking " to usage or custom,

either in Manila or elsewhere. The statute itself carefully. prescribes the limits of the banking business which this defendant may carry on. Under no possible construction do these prescribed limitations include the giving of bond or indemnity for the benefit of a client, or depositor. Though the charter does give to the defendant the *"general powers* mentioned in the Corporation Law," the exercise of such general powers may not be " incompatible with the provisions of this Act." The Corporation Law of the Philippine Islands was not introduced in evidence. We do not know what " general powers " are mentioned therein, but it seems clear to me that no " general power " however broadly defined in the Corporation Law could remove the limitations in regard to the transaction of banking business by this defendant contained in its own charter. If in terms such a " general power " were sufficient to include the giving of an indemnity agreement, the exercise of such power beyond the prescribed limits of the banking business which the defendant was permitted to carry on by its charter would be incompatible with the provisions of the charter.

The defendant had no power to make a contract of suretyship for the benefit of a depositor. It might do so to further its own business conducted within the limitations of its charter. (Williston on Contracts, sec. 1212.) Banks have been held upon contracts of suretyship either on the ground that they received the benefit of the transaction or that it was within its corporate powers, in *Appleton* v. *Citizens' Central National Bank* (190 N.Y. 417; affd., 216 U. S. 196); *Oklahoma City National Bank* v. *Ezzard* (58 Oklahoma, 251); *First National Bank of Aiken* v. *Mott Iron Works* (258 U. S. 240); *U. S. Fidelity Co.* v. *First State Bank* (116 Miss. 239); *Norton* v. *Derry National Bank* (61 N. H. 589); *People's Bank* v. *Manufacturers National Bank* (101 U. S. 181); *Thomas* v. *City National Bank* (40 Neb. 501). In all these cases the banks had a direct interest in obtaining the bond. They sought

benefit in connection with a transaction within their corporate power, and they received from the other party to the contract the benefit they sought.  Here, it seems to me, the case is different.  The bank made the indemnity agreement to induce the plaintiff to execute its bond intended to secure the release of the sum of $127,000 deposited with the sheriff and ·subject to the lien of an. attachment issued against the oil company.  The plaintiff had notice and knowledge of the purpose of the bond. So far there is nothing to show that the defendant's indemnity agreement was for its own benefit and within its corporate powers.  The money was, so far as the evidence shows, in fact the property of the oil company. When the bond made by the plaintiff was filed, the oil company received the moneys.  If there were nothing else in the case, contention could hardly be made that the defendant's contract of suretyship was other than a contract for the accommodation of the oil company, the defendant's depositor.  It appears, however, that when the defendant by cable from Manila authorized its New York agent to sign the indemnity contract, it also directed him to have the oil company's representative remit to Manila the fund when released.  This was done. The money received by the oil company was remitted to the defendant bank at Manila and credited in the oil company's bank account.  That bank account was at that time overdrawn by much more than the amount of the remittance.  It is said that these circumstances are sufficient to require the trier of the facts to hold that the defendant's contract was made for its own benefit and that it received for its own benefit the moneys released from attachment as the result of the indemnity agreement.

It is true that at the time the money was remitted to the defendant bank, the account of the oil company was overdrawn.  Automatically the deposit in the bank account reduced the amount of the overdraft.  Here, it is urged, was benefit received by the bank.  If that

constituted a benefit it was so slight as to be illusory. It was not the direct result of the release of the attachment. That placed the moneys, which had been held by the sheriff, in the control of the oil company. The defendant knew that the moneys, after release by the sheriff, would be within the control of the oil company. The defendant's cable from Manila contains a direction " have Helles " (the manager of the oil company) " remit fund here when received." That is a direction to remit to Manila; it is not an express direction that the money must be remitted to the defendant bank in Manila. The oil company's manager sent the check for the moneys received to the branch of the defendant bank in New York with directions to " remit by cable immediately to the Philippine Vegetable Oil Co., Inc., Manila, Philippine Islands." For all that appears, the oil company merely used the defendant bank as the instrument by which the money of the oil company in New York could be made available to that company at its principal office in Manila. The bank received it because the oil company deposited it when it received it, in the defendant bank. While thereby the oil company's overdraft was reduced, by contract previously made with the bank the oil company had a right to overdraw its account with the defendant bank for a large amount. That, it appears, is the form in which credit is by custom extended in the Philippine Islands by banks to those who desire loans. As soon as the moneys were placed in the oil company's deposit account, a credit for similar amount thereby became available to the oil company. It did avail itself of this new credit. At the end of the month the overdrafts were larger than before the moneys were remitted to the bank. The overdrafts were still larger when the oil company became insolvent.

For many purposes the relationship between bank and depositor is that of debtor and creditor. Theoretically, the depositor owns no money, but must rely upon the

bank's paying its debt. If we apply the theory consistently and for all purposes, it might be said that the remittance of moneys placed to the credit of the oil company to the same extent reduced the indebtedness of the depositor to the bank upon its overdraft, and that the indebtedness of the bank to the depositor was offset against the larger debt of the depositor to the bank. The theory may not, however, blind us to the actual facts. The practical similarity between money in bank and actual money in pocket " more or less has obliterated legal difference." (*Blackstone* v. *Miller*, 188 U. S. 189.) Here the bank did not in fact offset against the overdraft the amount of the deposit. By contract it had precluded itself from doing so. The benefit of the deposit inured to the depositor. Through the remittance the depositor gained the right to draw for similar amount, and the interest that was due from the depositor on overdrafts was correspondingly reduced during the short interval that elapsed before the depositor availed itself of its right to increase the overdraft.

In all cases which have been cited or which I have been able to find, an indemnity by a bank which has been held to come within the corporate powers of the bank has been primarily for the benefit of the bank, and in all cases in which a bank has been held liable for benefit received, the benefit has been the direct result of the *ultra vires* act and has been real and not illusory. No use would be served by analysing again the cases relied upon to sustain the conclusion reached in the opinion of Judge CRANE. In most respects I agree with the analysis he has made. I desire to point out only that in the case of *Central Transportation Co.* v. *Pullman's Car Co.* (139 U. S. 24) the court while allowing recovery in that case stated that " In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for,

property or money which it has no right to retain." Here, in fact, the defendant bank has not received or retained for its own benefit any money or property. In the latest case referred to in Judge CRANE's opinion (*First National Bank of Aiken* v. *Mott Iron Works*, 258 U. S. 240) the written guaranty of the contract for goods sold and delivered to third parties was made because such goods were required by the third parties in order to enable these parties to perform a building contract and to secure payments thereunder. This building contract and all payments due thereunder had previously been assigned to the bank. The bank was held liable, not for the value of the goods received by the third party, but for the payments which it secured by virtue of its assignment of the contract to it. The court pointed out, as Judge CRANE shows, that the bank is in the position of having realized the benefit to acquire which the guaranty was made, and of having realized it out of the proceeds of the goods that it induced the iron company to sell. Here it seems to me that we should be closing our eyes to the real facts if we were to hold that as matter of law the guaranty was made in order to enable the bank to acquire the more or less accidental and illusory benefit of an addition to the depositor's bank account. It is the depositor who in fact has realized the benefit.

It is also urged that since want of power on the part of the bank to execute this contract of indemnity is not apparent upon comparing the act done with the terms of the charter, but depends upon the extrinsic fact of whether it was made to secure an interest on the part of the bank or an interest of a depositor or other third party, the defense of *ultra vires* cannot prevail in the light of assertions made by the bank in executing the contract of indemnity. (See opinion of Judge SELDEN in *Bissell* v. *M. S. & N. I. R. Companies*, 22 N. Y. 258.) A contract of indemnity was signed and executed by both the oil company and the bank upon a printed bank form of the

plaintiff company. It recites: "That the suretyship is for the special benefit of the indemnitor, its property, income and earnings now owned or hereafter acquired, to which the Surety looks for its indemnity, and which the Indemnitor represents that it is specifically and beneficially interested therein."

That clause refers to indemnitor in the singular, though two parties signed as indemnitors. It is open to the construction that it refers to only one of the indemnitors. Before the indemnity agreement was made the defendant had requested the plaintiff to give the bond, not for itself, but for its depositor. It had informed the plaintiff of the fact that it was loaning large sums of money to the depositor, and it had asked the plaintiff to give the bond in reliance solely on the depositor's financial responsibility. I can find no intimation in the record that the plaintiff was in any way led to believe, except possibly through the provision of the agreement hereinbefore quoted, that the defendant bank was giving the indemnity agreement in connection with its own banking business, except in the sense that it was coming to the aid of a good customer. In view of these circumstances, I do not think that we should hold that the plaintiff might rely without further question on the ambiguous representation contained in its own printed form of contract. (*Wilson* v. *Metropolitan Elev. Ry. Co.*, 120 N. Y. 145.) At least it seems to me that the trier of the fact might reach contrary conclusion.

For these reasons the judgment should be affirmed.

POUND, ANDREWS, KELLOGG and O'BRIEN, JJ., concur with CRANE, J.; LEHMAN, J., dissents in opinion in which CARDOZO, Ch. J., concurs.

Judgment accordingly.