## GOTHAM NAT. BANK OF NEW YORK v. SHAROOD CO.

Circuit Court of Appeals, Second Circuit. January 16, 1928.

No. 57.

**I. Sales ⬅️72(I)—Agreement of bank, holding title to goods as security from seller, to hold boots specified in contract, held agreement to hold boots of quality called for by sales contract.**

Agreement of bank holding title to boots as security for debt due from seller, in letter to buyer, to hold "the boots specified in the contract," subject to an opportunity to verify sizes, held to be an agreement by bank to hold boots of quality, as well as size, called for by buyer's contract with seller.

**2. Frauds, statute of ⬅️33(I)—Agreement in form of promise to pay debt of another, made for promisor's own benefit, is not within statute of frauds.**

Where promisor has an immediate pecuniary interest of his own to be subserved, and makes promise in form of promise to pay debt of another for his own benefit, it is not within statute of frauds.

**3. Frauds, statute of ⬅️17—Promise of bank pledgee to hold goods of specified quality for pledgor's purchaser was not promise to answer for default of another.**

Promise of bank, holding title to goods as security for debt from seller, to hold goods of specified quality and size for purchaser from seller, bank's own debtor, was not promise to answer for default of another, within statute of frauds.

**4. Sales ⬅️196—Conduct of bank holding title to goods as security waived condition of punctual performance of sales contract.**

Conduct of bank, which held title as security to goods which were subject-matter of sales contract, which bank promised to hold goods of specified quality and size for buyer, in consenting to release goods and to accept payment from buyer, with full knowledge that parties were not performing in accordance with strict letter of contract, must be regarded as waiver of condition of punctual performance of sales contract.

**5. Sales ⬅️420—Defendant's contractual obligation and breach being established by uncontradicted evidence, court properly left to jury only question of damages.**

Contractual obligation of defendant bank, holding title to boots as security for debt from seller, to hold boots of specified quality and size for buyer, and breach of contract, being established by evidence without contradiction, court properly left to jury only question of damages.

**6. Appeal and error ⬅️1064(I)—In action for breach of sales contract, charge that bank, holding title to goods as security, promising to hold goods of specified quality, was liable as joint seller, held harmless error.**

In action for breach of sales contract, charge that defendant bank, holding title to goods sold as security from seller, and promising to hold goods of specified quality and size for buyer, was joint seller, held harmless error, where bank's contractual obligation and breach of it was established by evidence without contradiction, and court properly submitted to jury only question of damages.

**7. Banks and banking ⬅️260(I)—National bank, as pledgee, may agree to release pledged goods to purchaser from pledgor.**

National bank, as pledgee, may agree to release pledged goods to purchaser from pledgor.

**8. Banks and banking ⬅️260(I)—National bank, as pledgee, may warrant quality of goods it promises to release to purchaser from pledgor.**

As incidental to pledgee's power to agree to release pledged goods to purchaser from pledgor to realize on its collateral, national bank, which is pledgee, has power to warrant quality of goods it promises to release.

**9. Banks and banking ⬅️260(I)—Promise of national bank, holding title to goods as security, to hold goods of specified quality for purchaser from debtor, was not ultra vires.**

Promise of national bank, holding title to goods as security for debt due from seller, to hold goods of specified quality and size for buyer, was not ultra vires, since bank was co-operating with its debtor in arranging sale of collateral, in hope of liquidating its own claim.

**10. Principal and agent &#9758;171(1)—Where principal, knowing facts, retains benefit of unauthorized contract, he assumes its burdens.**

Where principal, without knowledge of facts, retains benefit of an unauthorized contract, he must be deemed also to have assumed its burdens.

**11. Banks and banking &#9758;262—National bank, retaining benefit of vice president's contract warranting quality of goods held as pledgee to buyer, after commencement of action, ratified contract.**

National bank, which held title to goods as security, by retaining benefits of contract after action thereon was commenced, ratified contract by vice president to hold specified quality and size of goods for buyer from its debtor, if vice president was unauthorized to make such contract.

**12. Sales &#9758;390—Rejection of defective goods did not constitute rescission of sales contract, and limit buyer to recovery of prepaid purchase price (Personal Property Law N. Y. § 150, par. 1 [d]).**

Buyer's rejection of defective goods did not necessarily constitute rescission of contract of sale, and limit buyer to recovery of prepaid purchase price, as provided by Personal Property Law N. Y. (Consol. Laws, c. 41) § 150, par. 1(d).

**13. Sales &#9758;418(1)—Buyer, rejecting goods without rescinding contract, could recover purchase price, storage and other charges thereon, and difference between contract price and market price (Personal Property Law N. Y. § 148; § 150, par. 1 [c], and par. 6).**

Buyer, rejecting defective goods without rescinding contract, was entitled to recover, as part of his damages, purchase price of defective rejected goods, storage and other charges thereon paid by buyer, and difference between contract price and market price of rejected goods as loss directly and naturally resulting from breach of contract under Personal Property Law N. Y. § 148, and section 150, par. 1 (c), and par. 6.

**14. Corporations &#9758;580—Proof of assignment of cause of action sued on from corporation contracting with defendants to plaintiff corporation of same name held sufficient.**

Proof of assignment of cause of action for breach of sales contract from Minnesota corporation buyer, making contract, to Delaware corporation of same name, suing defendants, *held* sufficient, where record showed that, with object of accomplishing corporate reorganization, buyer voted to sell "all the property" of its corporation to plaintiff corporation, which voted to accept "all the property" and assume all the liabilities, although, in schedule of accounts receivable, claim was listed at figure which did not include all damages recovered, but schedule also recited that defendant bringing error guaranteed sales contract, and that compensation for additional damages was being demanded of them.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Sharood Company against the Gotham National Bank of New York and others. Judgment for plaintiff, and the named defendant brings error. Affirmed.

The action was brought by Sharood Company, a corporation, against the bank, two individuals, Muller and Rebhan, copartners trading under the name of American Manufacturers' Export Company, and Teco, Inc., a corporation. Federal jurisdiction rests upon diversity of citizenship. At the close of the plaintiff's case, the action was discontinued as to the defendant Teco, Inc. Upon verdict of the jury judgment was entered against the other defendants for upwards of $22,000. The bank alone brings this writ of error.

Jonas & Neuburger, of New York City (Murray L. Jacobs and Lyle Evans Mahan, both of New York City, of counsel), for plaintiff in error.

Szold, Perkins & Brandwen, of New York City (Robert Szold and David L. Podell, both of New York City, and Irvine J. Shubert, of Brooklyn, N. Y., of counsel), for defendant in error.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). For an understanding of the questions of law presented by this record, it will be necessary to state the facts in some detail. Teco, Inc., was largely indebted to the bank for moneys loaned to it to finance the purchase of great quantities of army merchandise imported from France for sale. As security for the indebtedness, such merchandise was lodged in storage warehouses in New York City, to be released upon authorization of the bank, which held nonnegotiable warehouse receipts therefor issued in the name of the bank. The copartnership of Muller & Rebhan, trading under the name of American Manufacturers' Export Company, hereafter called the seller, was selling agent of Teco, Inc., for the stored merchandise. Among such merchandise were thousands of cases of rubber boots. Sharood Company, a Minnesota corporation, was a mail order house located in Minneapolis. This corporation will hereafter be called the buyer. After the transactions in suit, it assigned all its property to a Delaware corporation of the same name, which is the plaintiff.

Julius Fligelman, an officer of the buyer, entered into preliminary negotiations with the seller for the purchase of a large quantity of rubber boots. On March 18, 1922,

Mr. Muller, of the partnership seller, took Mr. Fligelman to the office of the bank and introduced him to Mr. Hauser, an assistant vice president of the bank. Fligelman stated that he knew nothing about the responsibility of the seller, and wanted the assurance of the bank that he would get delivery of the boots if he entered into a contract with the seller for the purchase of them. Terms were discussed, and Hauser exhibited a sample boot which was a new, first-quality, American Rubber hip boot. After terms were agreed upon, Hauser drew up two documents. One was signed in duplicate by Fligelman and Muller, and read as follows:

"Contract.

"March 18, 1922.

"Buyer: Sharood Company, 444 Stinson Boulevard, Minneapolis, Minn.

"Seller: American Manufacturers' Export Co., 41 Park Row, New York.

"Commodity: American Rubber hip.

"Quality: First quality boots

"Quantity: 61,200 pairs

"Packed: Twelve pairs to a case, solid sizes.

| "Size | 7 | 357 cases. |
|---|---|---|
| " | 8 | 1938 " |
| " | 9 | 1734 " |
| " | 10 | 765 " |
| " | 11 | 306 " |

"With 3% variation on sizes either way.

"Price: $1.42½ per pair (one dollar forty-two and one-half cents) f. o. b. New York

"Delivery: To Minneapolis, only—

| Immediately, | 8,400 | pairs |
|---|---|---|
| April 28th, | 8,400 | " |
| May 28th, | 8,400 | " |
| June 28th, | 12,000 | " |
| July 28th, | 12,000 | " |
| August 28th, | 12,000 | " |

"Payment: By fifteen-day acceptance from date of shipments.

"This contract is not subject to cancellation. Seller agrees not to sell at lower price, to any one.

"F O B New York.

"Sharood Company,

"[Signed] Julius Fligelman.

"American Manufacturers' Export Co.,

"[Signed] B. S. Muller."

The other document, signed by Hauser and delivered to Fligelman, was the following letter:

"March 18, 1922.

"Sharood Company, 444 Stinson Boulevard, Minneapolis, Minn. Attention: Mr. Fligelman. Gentlemen: Conforming to the contract entered into this day between yourselves and the American Manufacturers' Export Company, we agree to hold for your account and subject to your orders for shipment to Minneapolis, the boots specified in said contract.

"This agreement is subject to change on sizes if, upon inspection, we find there is any difference in sizes specified and the actual sizes on hand. It is understood that, if we do not notify you by letter posted on or before March 21, 1922, to Mr. Fligelman, that we will definitely hold these boots in accordance with said contract. Yours very truly, Gotham National Bank of N. Y., George D. Hauser, Assistant Vice President."

On March 20, 1922, Hauser sent the buyer another letter, similarly signed, which read as follows:

"Pursuant to the matter contained in our letter of March 18th, we wish to inform you that, having investigated the sizes of boots in warehouse, we find that all sizes are correct and have issued instructions to hold sizes for your account, with the exception of size No. 11. It may be necessary to reduce the number of elevens, and to add to other sizes accordingly, and we would ask that you take the matter up with Mr. Muller, of the American Mfg. Export Company.

"It is not within our province to make any changes in sizes directly with you, but we merely wish to go on record in saying that this size may have to be changed. As yet we are not quite sure, but are having a definite check made."

Boots of which no complaint was made were thereafter shipped to buyer in the following installments:

| Invoice and Shipping Date. | Rec'd Date. | Pairs Rec'd. |
|---|---|---|
| Mar. 18, 1922 | Apr. 12, 1922 | 2,400 |
| "  21 | "  12 | 6,000 |
| Apr. 24 | May 5 | 8,400 |
| June 28 | July 20 | 8,400 |
| Aug. 10 | Sept. 8 | 12,000 |
| Sept. 29 | Oct. 10 | 12,000 |

It is to be noted that, after the April shipments, the deliveries were later than the dates stipulated for delivery in the buyer's contract with the seller. This was pursuant to correspondence between them. In the case of each delivery, shipping documents, consisting of invoice and bill of lading, were accompanied by a draft drawn in the name of the seller upon the buyer and payable to

the order of the bank. The first three drafts were 15-day drafts; the last three were sight drafts. All were paid by the buyer. The use of sight drafts, instead of the 15-day drafts specified in the contract, was a concession suggested by the buyer, when it requested the seller to delay shipments.

The final installment of 12,000 pairs of boots was sent November 13, 1922. This was several weeks later than the date specified for it in the correspondence between buyer and seller which modified the original delivery dates. Of this shipment, 6,948 pairs were admittedly defective. The defective boots were immediately rejected by the buyer, and placed in storage for the account of the defendants; notification of rejection was given to the seller and to the bank, and demand made upon them to deliver goods of the contract description. This was not done. The sight draft for $17,340, which accompanied the shipping documents for this final installment, having been paid to the bank by the buyer, suit was brought.

The first count of the complaint charged the defendants as joint promisors in a contract of sale; a second count charged the bank upon the contract set out in the letters written by Hauser; a third count, charging conversion, was dismissed by the court, and need not be further mentioned. The answer of the bank, in addition to denying the material allegations of the complaint, set up defenses of ultra vires, of the statute of frauds, and of release by modification of delivery dates without its consent. The court charged the jury in effect that the bank was a party to the contract of sale, that the contract had been broken, and that the only question for the jury was that of damages. The items of damages claimed by plaintiff and allowed by the jury in its verdict were three: (1) The purchase price of the defective rejected boots; (2) storage and other charges thereon paid by plaintiff; and (3) the difference between the contract price and the market price of the rejected boots—the total being $19,681.75, exclusive of interest.

Apparently it was the theory of the court that the document executed by the buyer and seller and the letters above set out, signed by Hauser for the bank, constituted a single contract of sale between the buyer and the two defendants. It may be conceded that this theory was erroneous, and that the bank's motion to dismiss the first cause of action, which charged the defendants as joint sellers, should have been granted. Nevertheless, since the verdict was general, the judgment may stand, if the second count

will support it, and if no harmful error occurred in the course of the trial.

The second count sets up the contract evidenced by Hauser's letter of March 18, 1922, in which the bank says to the buyer: "Conforming to the contract [between you and the seller] * * * we agree to hold for your account and subject to your order for shipment to Minneapolis the boots specified in said contract." After referring to investigation of sizes, the letter concludes: "It is understood * * * that we will definitely hold these boots in accordance with said contract."

[1] Assuming for the present the authority of Hauser to bind the bank by such a letter, what is the extent of its obligation? Is it merely a promise, such as a bailee might ordinarily make, to release to the buyer, upon his payment for them, goods of the seller upon which the bailee has a lien, without any agreement by the bailee as to the quality of the goods, or is it a promise to hold for the buyer goods of the size and quality specified in the contract referred to between buyer and seller? In view of the circumstances, we think it should be given the wider meaning. The witness Lindberg testified he was specially employed by the bank to inspect and supervise the handling of the consignment of boots, approximately 500,000 pairs, pledged by Teco as collateral; that he was familiar with the quality of these boots placed in storage, from handling and seeing them; that the greater part were of first quality, but some were of inferior grade. Hauser had a sample boot on exhibition in his office when the documents were signed. He knew that the buyer was unwilling to rely solely upon the seller's responsibility. He took part in the discussion of terms between buyer and seller, and then drew the documents. The letter of March 18th assumes that the bank is required to hold boots of the specified sizes, and hence reserves the opportunity to investigate before definitely committing itself. The implication is strong that the matter of sizes is the only exception. Under the facts disclosed in this record, when the bank agreed to hold "the boots specified in the contract" subject to an opportunity to verify sizes, we think it agreed to hold boots of the quality, as well as the size, called for by the buyer's contract with the seller. Indeed, the bank concedes in its brief that, if the contract is binding, it obligated the bank to hold boots of the specified quality up to August 28, 1922, the final delivery date stipulated in the contract between buyer and seller.

[2] But the bank contends that its agreement was a mere guaranty of performance by the seller, and hence void under the statute of frauds, or, in any event, invalidated by the seller's extension of the dates of delivery. In form the bank's promise was not a guaranty of performance by the seller of his obligations to the buyer. But, even if it were considered to be a guaranty, it is well settled that, where the promisor has an immediate pecuniary interest of his own to be subserved, and makes the promise for his own benefit, it is not within the statute of frauds. Emerson v. Slater, 22 How. 28, 16 L. Ed. 360; Davis v. Patrick, 141 U. S. 479, 12 S. Ct. 58, 35 L. Ed. 826; Cincinnati Traction Co. v. Cole (C. C. A. 6) 258 F. 169; Guaranty Trust Co. v. Koehler (C. C. A. 8) 195 F. 669; Farnham v. Chapman, 61 Vt. 395, 18 A. 152; 1 Williston, Contracts, § 484.

In the case first cited, Mr. Justice Clifford says, at page 43: "But whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability."

In Farnham v. Chapman, supra, it appears that Stapleton owed a debt to the defendant, to whom he delivered a horse, with authority to sell it and apply the proceeds in payment of the debt. The defendant, as Stapleton's agent, sold the horse to the plaintiff, and orally promised that if the title was not right he would make it so. When sued upon this promise the defendant set up the statute of frauds. The court said that, although there was an implied warranty of title by Stapleton, the plaintiff did not rely upon it, or upon the responsibility of Stapleton, whom he did not know, but upon the promise of the defendant, and that the fact that the sale would result in payment of Stapleton's debt to the defendant was the consideration for his promise to make good the title. Therefore it was held that the defendant's promise was not collateral to Stapleton's warranty of title within the meaning of the statute of frauds.

[3] The principle of these authorities is applicable to the case at bar. The position of the bank was not that of a guarantor. It held title, as security, to the very goods which were the subject-matter of the contract between buyer and seller, and the seller could make no deliveries without the bank's consent, since it held in its own name nonnegotiable warehouse receipts. The buyer was unwilling to deal only with the seller, whose financial responsibility was doubted. He therefore exacted from the bank an agreement to hold for him goods of the specified size and quality for which he contracted with the seller. The bank was willing to make this undertaking, in order to apply the proceeds of the sale toward payment of the debt for which the boots were pledged. Invoices were to be delivered to the bank, drafts in payment for the goods were to be drawn in its favor, and the proceeds would be available to apply in reduction of the seller's debt to it. Its purpose was to serve its own pecuniary interest. It did not make a collateral guaranty of performance by another, but in connection with realizing upon its own pledge it promised to hold goods of a specified quality and size for a purchaser from its own debtor. Its promise was, therefore, not one to answer for the default of another.

[4] The bank contends that it was released by the extension of the dates of delivery by agreement between buyer and seller. As we view this contract, it is not one for the application of the rule that an extension of time granted to the principal debtor without the consent of the surety discharges the latter. We must look, not to the rules of suretyship, but to the wider law of contracts, to determine the scope of the bank's obligations. It may be assumed that the bank would have been privileged after August 28th to refuse to perform its promise to hold the boots for the buyer, since time is usually of the essence in commercial contracts, and punctual performance by the buyer must be regarded as an implied condition precedent to the bank's duty to perform its promise. But it did not choose to avail itself of that privilege. Rather, with full knowledge that the parties were not performing in accordance with the strict letter of their contract, it consented to release the goods and to accept payment from the buyer. Not until after the buyer had rejected part of the final installment as defective, and the bank had been called to account, did it suggest that the modified performance had relieved it from its contractual obligations. Such conduct must be regarded as a waiver of the condition of punctual performance. See 2 Williston, Contracts, §§ 678, 688, 856; Corbin's Anson on Contracts, § 365; Schweyer

Elec. & Mfg. Co. v. Regan (C. C. A. 2) 4 F.(2d) 970; Parsons v. Washington Const. & Bldg. Co., 69 Wash. 595, 125 P. 954.

We say that the bank did this with knowledge of the facts for the following reasons: The March and April installments were shipped, and 15-day drafts were drawn against the buyer in accordance with the original terms. Thereafter the shipments were made in accordance (excepting some variation in dates) with the terms stated in the correspondence between buyer and seller (Plaintiff's Exhibits 31–37); that is, the May shipment was postponed to June, the June shipment to August 10, etc.; sight drafts, instead of 15-day drafts, accompanied the bills of lading, and the buyer was charged an additional sum as storage for 30 days at 2 cents per pair of boots, as shown in the invoice (Plaintiff's Exhibit 13). The procedure in making shipments was for the seller to prepare an invoice for the price of the installment to be shipped, and to deliver such invoice to the bank. Either the seller would draw a draft on the buyer and deliver it to the bank, or the bank would itself draw such a draft. The bank then issued an order to release from storage the goods covered by the invoice, the same were delivered to the carrier, and the bill of lading therefor was delivered to the bank, and the bank then sent on for collection the draft, accompanied by the bill of lading and invoice.

Now the bank knew the original contract terms for delivery to and payment by the buyer, knew they were adhered to in the installments delivered during the first two months, and knew that in all subsequent installments they were departed from, and that the seller, instead of invoicing for shipment at the contract dates, was invoicing at later dates, was charging two cents per pair for storage, and was drawing sight drafts, instead of 15-day drafts. The same order number, 1448, appears upon the first invoice and upon the last, and we cannot doubt that the bank knew that all of the shipments were under the original contract between buyer and seller, modified in the respects indicated. Its conduct was consistent only with a recognition that its contract with the buyer continued to be binding in spite of his failure to take the goods at the dates originally specified.

[5, 6] The bank's contractual obligation and the breach of it being established by the evidence without contradiction, the court was right in leaving to the jury only the question of damages, and its error in charging that the bank was liable as a joint seller, if its charge is to be so construed, as the bank contends, was harmless. Before taking up the correctness of its charge as to damages, we will dispose of other objections to the contract.

[7-9] It is urged that the bank's promise was ultra vires. It is true, of course, that a national bank may not engage in buying and selling merchandise, nor guarantee for accommodation the debt of another. But it is equally true that it may realize on collateral security lawfully taken. No authority is cited for the suggestion that this can only be done after default by the pledgor. Ordinarily, indeed, the power to deal with third persons in realizing on security is exercised only after default by the pledgor; but we see no reason why the power should be so limited, if the pledgor consents to the transaction. A bank may do many things to protect assets and save debts that would be ultra vires if engaged in as a primary business of that nature. See Second Nat. Bank v. U. S. Fidelity & G. Co. (C. C. A. 4) 266 F. 489. Compare Germania Nat. Bank v. Case, 99 U. S. 628, 25 L. Ed. 448, with California Bank v. Kennedy, 167 U. S. 362, 366, 17 S. Ct. 831, 42 L. Ed. 198.

Undoubtedly a pledgee may agree to release the pledged goods to a purchaser from the pledgor. As incidental to this power to realize on its collateral the pledgee has power to warrant the quality of the goods it promises to release. See People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907; Am. Surety Co. v. Philippine Nat. Bank, 245 N. Y. 116, 156 N. E. 634; Farmers', etc., Bank v. Bluefield Nat. Bank (C. C. A. 4) 11 F.(2d) 83, 85; Pan-Am. & C. Co. v. Nat. City Bank (C. C. A. 2) 6 F.(2d) 762. The bank was neither jobbing in rubber boots nor acting as surety for its debtor, but was co-operating with its debtor in arranging a sale of the collateral in the hope of liquidating its own claim. Such a transaction is not ultra vires. See Morris v. Third Nat. Bank of Springfield (C. G. A. 8) 142 F. 25, 31.

[10] The authority of Hauser as the bank's agent is disputed. He was an assistant vice president and had complete charge of releasing the goods held in pledge. It is not necessary, however, to determine whether the making of the contract in question was within the scope of Hauser's authority, since the subsequent conduct of the bank constituted a ratification of his acts. Where the principal with knowledge of the facts retains the benefit of an unauthorized contract, he must

be deemed also to have assumed its burdens. People's Bank v. Nat. Bank, supra; Aldrich v. Chemical Nat. Bank, 176 U. S. 618, 20 S. Ct. 498, 44 L. Ed. 611; Mutual Oil Co. v. Hills (C. C. A. 9) 248 F. 257; Am. Nat. Bank v. Nat. Wall-Paper Co. (C. C. A. 8) 77 F. 85.

[11] We see no reason why the ratification should be less effective when the principal acquires such knowledge after commencement of an action on the unauthorized contract and continues to keep its benefits. See Edgar v. Breck & Sons Co., 172 Mass. 581, 52 N. E. 1083; Eadie Guilford & Co. v. Ashbaugh, 44 Iowa, 519. Let it be assumed that Hauser was the only agent of the bank who knew of the contract made in its name during all the time that the boots were being shipped. On December 4, 1922, the bank was notified by the buyer of the defective delivery; it consulted the seller, as shown by its reply, and later sent a man to Minneapolis to examine the goods claimed to be defective. This is scarcely consistent with a supposition that the bank thought it had no contract relations with the buyer. But in any event it was notified of the contract by the bill of particulars and thereafter failed to return the moneys paid to it by plaintiff by reason of the contract. It must therefore be deemed to have ratified it.

[12, 13] We come, then, to the measure of damages. The court below applied the rule defined by section 148 of the New York Personal Property Law (Consol. Laws, c. 41); i. e., "the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract." The bank contends that section 150 should govern, and that the buyer's recovery should be restricted to either (1) damages for breach of warranty, or (2) recovery of the purchase price which had been paid. It may well be doubted whether the Sales Act applies to a pledgee's contract to hold goods of a specified size and quality for a purchaser from the pledgor. But, assuming that it does apply, and assuming further that section 150 is the applicable section, the same recovery may be had as under section 148 of the act, or as might be recovered under the general law of damages if the Sales Act is inapplicable. Section 150, par. 1 (c) permits the buyer to "refuse to accept the goods, if the property therein has not passed, and maintain an action against the seller for damages for the breach of warranty," and paragraph 6 of section 150 declares that "the measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordi-

nary course of events, from the breach of warranty."

The contention that rejection of the defective goods necessarily constitutes a rescission of the contract of sale and limits the buyer to recovery of the prepaid purchase price, as provided by subsection (d), par. 1, is not sustainable. Taylor v. Saxe, 134 N. Y. 67, 31 N. E. 258; Gilbert v. Alton, 88 N. Y. App. Div. 62, 84 N. Y. S. 682; Lowinson v. Newman, 201 N. Y. App. Div. 266, 194 N. Y. S. 253. And see note, 27 L. R. A. (N. S.) 925. And where there is rejection of the goods, without rescission of the contract, the buyer is entitled to recover as part of his damages those items which were included by the trial court as the loss directly and naturally resulting from the breach of contract. This was the measure of damages applied in Taylor v. Saxe, supra; Sussman v. Mitsui & Co., 114 Wash. 294, 195 P. 3; Tompkins v. Lamb, 121 N. Y. App. Div. 366, 106 N. Y. S. 6, affirmed 195 N. Y. 518, 88 N. E. 1133; Punteney-Mitchell Mfg. Co. v. Northwall Co., 66 Neb. 5, 91 N. W. 863. If the Sales Act is inapplicable, the rule of damages would be the same. The three items of damages claimed by the plaintiff were proper elements of the damage directly caused by the bank's breach of contract. Therefore the issues submitted to the jury on the question of damages were properly left to them.

[14] It is further contended that there was no proof of assignment to the plaintiff of the buyer's cause of action against the bank. The record shows that, with the object of accomplishing a corporate reorganization, the buyer voted to sell "all the property" of this corporation to the plaintiff corporation which voted to accept all the property and assume all the liabilities. It is true that the schedule of accounts receivable, referred to in the votes, listed the claim as one against the seller for $11,344.15, a figure which does not include the damage due to the difference between the contract price and the market price of the defective boots. But the schedule also recites that the bank "guaranteed" the export company's contract and that "compensation for additional damages is being demanded of them." The purpose was to convey "all the property" and the reference in the schedule was sufficient.

Alleged errors in rulings on evidence need not be considered. In the view we take of the case, the evidence received, even if not competent against the bank, could not have been prejudicial.

Finding no prejudicial error in the record, we affirm the judgment.