### MERCHANTS' BANK OF VALDOSTA v. BAIRD.

(Circuit Court of Appeals, Eighth Circuit. March 2, 1908.)

No. 2,512.

1. BANKS AND BANKING—CERTIFIED CHECKS—NATURE OF BANK'S LIABILITY.

The certification of a check by a bank, like the acceptance of a draft, creates an original, actionable liability against the bank, and implies that, when the check is certified, the drawer has sufficient funds with the bank, and that they have been set apart and will be retained for the holder whoever he may be, and whenever the check may be presented.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, §§ 419, 421.]

2. SAME—NATIONAL BANKS—GUARANTY OF CHECKS—NOTICE OF INVALID TRANSACTION.

A state bank was chargeable with notice that the credit and resources of a national bank were being unlawfully used, barring recovery against the national bank's receiver on checks on the national bank by a corporation, where the national bank's president had written the state bank obligating his bank unconditionally to pay all checks of the corporation, not aggregating more than $5,000 weekly, and the national bank afterwards wired that it would "protect" the corporation's checks for $5,000 weekly in excess of "present guaranty," and later that the state bank would pay checks in excess of "guaranty" drawn during the current week.

3. SAME—POWER OF NATIONAL BANKS.

A national bank may warrant the title to property it conveys, or become liable as an indorser or guarantor of obligations which it rediscounts or sells, but it cannot lend its credit to another by becoming surety, indorser, or guarantor for him, such an act being ultra vires, and, when its true character is known, no rights grow out of it, though it has taken on in part the garb of a lawful transaction.

4. SAME—ULTRA VIRES ACT—ESTOPPEL.

An act of a national bank, void because ultra vires, cannot be made good by estoppel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, §§ 991–1000.]

In Error to the Circuit Court of the United States for the District of Minnesota.

The Merchants' Bank of Valdosta sued the receiver of the First National Bank of Faribault to recover upon eight checks drawn by the Minnesota Lumber Company upon the latter bank, and cashed by the former upon the authority of a letter and two telegrams. The case was tried by the court upon the pleadings and an agreed statement of facts. The defendant had judgment, and the plaintiff prosecuted this writ of error. The facts are substantially as follows: At the time of the transactions in question the plaintiff was a bank organized under the laws of Georgia, and doing business at Valdosta, in that state. The lumber company was a corporation engaged in manufacturing lumber in Georgia. The First National Bank of Faribault, as its name indicates, was a banking association organized under the laws of the United States. It was engaged in business at Faribault, Minn., and its capital was $50,000. For some years prior to September 6, 1904, the lumber company had an account with the National Bank, but in one form or another it was always indebted to the bank. On September 6, 1904, it owed the bank $11,848.66 on its own notes and notes of others made for its benefit. Besides this, the bank had purchased and then held bonds of the lumber company, unsecured by mortgage or other lien, amounting to $33,500. Prior to the date mentioned the plaintiff, the Georgia bank, had been paying checks drawn by the lumber company upon the National Bank, obtaining in each case the authority of the latter to do so, but in order to obviate the trouble and expense incident to that

course it wrote the National Bank on September 1, 1904, for general authority to pay such checks. On September 6, 1904, T. B. Clement, as president of the National Bank, replied as follows:

"Faribault, Minn., 9–6–04.

"Merchants' Bank of Valdosta, Valdosta, Ga.

"Gentlemen: In reply to your letter of the 1st regarding checks drawn by the Minnesota Lumber Company on this bank, would say that there is no reason for Mr. Trump acting for the Minnesota Lumber Company, drawing any checks that this bank would not honor, but think there should be some limit placed, and we will say that checks of the Minnesota Lumber Co.'s drawn by J. H. Trump or H. O. Clement on this bank will be paid up to the amount of $5,000.00 in any one week. If any more than $5,000.00 should be drawn in any one week, have them wire for permission."

On December 6, 1904, the National Bank wired the Georgia bank as follows:

"Faribault, Minn., 6 Dec. 1904.

"Merchants' Bank, Valdosta, Ga.

"We will protect checks of Minnesota Lumber Company for five thousand dollars per week in excess of present guarantee."

And on December 22, 1904, it further wired the Georgia bank as follows:

"Faribault, Minn., Dec. 22, 1904.

"Merchants' Bank, Valdosta, Ga.

"You can pay checks Minnesota Lumber Company on us this week in excess of guaranty on personal request of H. O. Clement."

T. B. Clement as president signed the name of his bank to both telegrams. H. O. Clement, mentioned in the last telegram, made the personal request therein required. He was a son of T. B. Clement. In reliance upon these communications, and upon the previous course of dealing, the Georgia bank cashed the checks of the lumber company amounting to $125,000 between September 6, 1904, and January 1, 1905, all of which were honored and paid by the National Bank excepting the last eight for $1,000 each, and excepting that upon one of the eight a part payment was made. The National Bank became insolvent and was closed by the Comptroller of the Currency January 2, 1905. The lumber company was also insolvent. At the close of the bank the lumber company owed the National Bank $33,500 on unsecured bonds and $43,560.32 on other account. The directors of the defunct bank had left the management thereof wholly to T. B. Clement, the president, and they were not aware of the transactions carried on between the two banks and the lumber company. The National Bank was not interested in the business of the lumber company excepting as a creditor. The Georgia bank knew that the proceeds of the checks were for use in the business of the lumber company. Between September 6, 1904, and the 1st of the following January, the account of the lumber company upon the books of the National Bank generally showed a credit balance, but this condition was largely due to the "kiting" of checks and drafts. When the National Bank was closed, there were outstanding and unpaid drafts and checks amounting to over $35,000, for which the lumber company had received credit in its account, and by charging them back a large overdraft would result. It was stipulated that the Georgia bank was not aware of the condition of the lumber company's account with the National Bank, and that it believed that the latter was a bank in good standing, well managed, and that its president was a person of integrity, of good business management, and deserving of trust and credit, but it also appeared that the keeping of checks and drafts afloat, corresponding in amount with checks cashed by the Georgia bank, was known to it, for in part they were sent to that bank with remittances for checks paid by it. In other words, when the National Bank sent the Georgia bank money or drafts in payment of checks cashed by the latter, it would also send for collection a corresponding draft or check of the lumber company. Checks drawn by the lumber company on the Georgia bank were employed in the kiting process; also drafts drawn by the lumber company upon itself. The time required for transmission of the collection items from Georgia to Minnesota and back again to Georgia made

the plan feasible. The agreed statement of facts contained this clause: "When the First National Bank paid checks in cash and sent drafts therefor to its correspondent, if the drafts were paid, the said First National Bank saved the charges for exchange incident to the shipment of actual money to keep up its balance in the hands of such correspondent."

Robert Mee, for plaintiff in error.

Thomas H. Quinn, for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

HOOK, Circuit Judge (after stating the facts as above). It was known to both the National Bank and the lumber company that the credit and resources of the former were being used to uphold and further a venture in which it could not lawfully engage. But the question remains: How did it appear to the Georgia bank? Did it have the aspect of legitimate banking business or of a guaranty for another? The letter of September 6, 1904, purported to obligate the National Bank unconditionally to pay all checks of the lumber company up to the amount of $5,000 in any one week. No limitation was expressed in the letter that had regard either to the condition of the company's account, whether in credit or in debit, or to its future conduct or solvency. The president of the National Bank did not say he was confident the lumber company would not draw checks in excess of its rights as a customer, but that there was no reason for its drawing checks his bank would not honor. There was no pretense of a certification of checks in the customary meaning of that phrase. The certification of a check, like the acceptance of a draft, creates an original liability on the part of the bank upon which an action may be maintained, and it implies that at the time the check is certified the drawer has sufficient funds with the bank and that they have been set apart and will be retained for the holder, whoever he may be, and whenever the check may be presented. The bank undertakes that the check is good at the time it is certified, and that it shall continue so until finally paid. Though an officer may bind his bank by certifying a check in the absence of funds of the drawer Congress has made the act a misdemeanor. U. S. Comp. St. 1901, p. 3497, § 5208. In some respects a certified check is not unlike a certificate of deposit payable to the order of the depositor. The customary and proper practice is for the certifying bank to at once charge the account of the drawer with the amount of the check, and thus protect itself against loss from its assumption of liability by completing the withdrawal of the amount from his further control. Merchants' Bank v. State Bank, 10 Wall. 604, 648, 19 L. Ed. 1008.

But the letter of September 6 had no reference to checks then in existence. The amount of checks that would be drawn in the future within the prescribed limit was not known, nor was there any definite time limit to the duration of the undertaking evidenced by the letter. The power of the bank to put an end to its continuing promise to pay checks of the lumber company was not a safeguard against loss. Under the terms of the letter a liability would arise in Georgia before it would be known in Minnesota. Regarded most favorably, the letter

evidenced a transaction that was of doubtful regularity. Since the proper certification of a check signifies that the maker has sufficient funds with the bank an agreement to certify checks to be drawn in the future is so out of the usual banking course as to challenge attention.

The true purpose of the writer of the letter and the real relation between his bank and the lumber company was disclosed by the telegrams of the 6th and 22d of December. In the first of these the limit per week was raised to $10,000, and in the second the limit was entirely removed. In both telegrams the obligation attempted to be assumed by the letter of September 6th was referred to as a guaranty. Neither of the telegrams authorized the inference that the checks to be drawn by the lumber company were upon its funds then with the bank, or that payment depended upon funds being placed there by it. The first one is particularly significant, in that the undertaking was to "protect" checks of the lumber company for $5,000 per week in excess of "present guarantee." Even more significant of the true situation is the telegram of December 22d. It referred to the undertaking as a guaranty, and purported to bind the National Bank to pay all checks that might be drawn upon it within the given period without regard to the amount. This was manifestly beyond the power of the bank as it put at hazard, upon the mere act of the lumber company, the duty of the bank to the government, the interests of its shareholders, and the funds of its depositors. In this connection, it is said that the amount of the eight checks in controversy, $8,000, was within the limit prescribed by the telegram of December 6th, but these checks were drawn between December 27th and 31st, inclusive, and at that time the Georgia bank had before it the letter and both telegrams, and was therefore advised of the character of the obligation which the National Bank was attempting to assume. The letter and telegrams taken together were sufficient to advise the Georgia bank at the time it cashed the checks in controversy that the National Bank was lending its credit to the lumber company. If the latter had the right to draw the checks, and if it was the duty of the bank on which they were drawn to pay them, it would not have agreed to "protect" them or referred to its obligation as a "guaranty." The term "guaranty" has a different signification, and ordinarily a bank does not agree to protect a check which it is its duty to pay. Both terms employed pointed quite clearly to the real relation between the National Bank and the lumber company, and, if there was otherwise any doubt, the removal of all limit to the obligation attempted to be assumed should have dispelled it.

A national bank may warrant the title to property it conveys, or become liable as an indorser or guarantor of notes or other obligations which it rediscounts or sells because to do so is incidental to the business it is authorized to transact, and to the disposition of property it has lawfully acquired. But it cannot lend its credit to another by becoming surety, indorser, or guarantor for him. It cannot for the accommodation of another indorse his note or guarantee the performance of obligations in which it has no interest. Such an act is an adventure beyond the confines of its charter, and, when its true character is known, no rights grow out of it. though it has taken on in part the garb of a lawful transaction. Commercial Nat. Bank v. Pirie, 82 Fed.

799, 27 C. C. A. 171; Bowen v. National Bank, 94 Fed. 925, 36 C. C. A. 553; Id. 87 Fed. 430. An act that is void because beyond the power of a national bank cannot be made good by estoppel. McCormick v. Market Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198. It is urged that the National Bank profited by the transactions to the extent of exchange, and that it retained the benefit. It is difficult to find any profit to the bank in these transactions. If there was any, it was swallowed up in losses.

The judgment is affirmed..