SPONGE EXCH. BANK OF TARPON SPRINGS v. COMMERCIAL
CREDIT CO.*

(Circuit Court of Appeals, Fifth Circuit. February 14, 1920.)

No. 3389.

1. BANKS AND BANKING ☞98—SALES ☞6—ARRANGEMENT UNDER WHICH ADVANCES WERE MADE ON NOTES HELD NOT "PURCHASES," BUT LOANS AT USURIOUS INTEREST, AND BANK ACTING AS INTERMEDIARY AN ACCOMMODATION INDORSER.

An arrangement under which a bank advanced to a payee of notes 77 per cent. of their amounts, and turned them over to a credit company, which advanced the same amount to it, and was to pay the other 23 per cent. out of payments on the notes after deducting a charge of 1 per cent. per month, the bank making a charge not measured by the time elapsing between the date of its payments and the date of its reimbursement, was not a purchase of the notes by either party, but a loan on the notes at a

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 252 U. S. ——, 40 Sup. Ct. 587, 64 L. Ed. ——.

usurious rate of interest, and the bank was a mere accommodation indorser of notes in which it never had any beneficial interest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Loan; Purchase.]

2. SALES ⬦6—TRANSACTION IS NOT A "SALE" WHERE INDORSER IS TO ACCOUNT FOR COLLECTIONS IN EXCESS OF ADVANCES WITH INTEREST.

When by the terms of a transaction by which an indorsee acquires a note he is required to pay or account to the indorser for so much of what is collected on it as exceeds the amount advanced and agreed interest thereon, the transaction is not a "sale."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

3. APPEAL AND ERROR ⬦843(2)—PLEA OF PAYMENT NEED NOT BE CONSIDERED WHERE UNCONTROVERTED EVIDENCE ENTITLED DEFENDANT TO VERDICT ON ANOTHER PLEA.

On appeal in an action against a bank on notes, its plea of payment need not be considered, where the uncontroverted evidence sustained its plea that the indorsement of the notes was a mere lending of its credit to the notes.

4. BANKS AND BANKING ⬦98—UNDER STATUTE BANK COULD NOT LOAN ITS CREDIT TO NOTE BY ACCOMMODATION INDORSEMENT.

Under Gen. St. Fla. 1906, § 2707, a bank is not permitted to lend its credit to paper which it does not own, and in which it has no beneficial interest, by indorsing such paper.

5. EVIDENCE ⬦66—PARTIES DEALING WITH BANK WERE CHARGED WITH KNOWLEDGE OF STATUTE UNDER WHICH IT COULD NOT MAKE ACCOMMODATION INDORSEMENT.

Parties advancing money on notes taken through a bank, which acted as intermediary, were chargeable with notice of the law of the state, under which the bank could not bind itself by an accommodation indorsement of notes which it did not own, and in which it had no beneficial interest.

In Error to the District Court of the United States for the Southern District of Florida; Rhydon M. Call, Judge.

Action by the Commercial Credit Company against the Sponge Exchange Bank of Tarpon Springs. Judgment for plaintiff, and defendant brings error. Reversed.

See, also, 253 Fed. 255.

James F. Glen and K. I. McKay, both of Tampa, Fla. (McKay & Withers, of Tampa, Fla., on the brief), for plaintiff in error.

N. B. K. Pettinghill and M. B. Macfarlane, both of Tampa, Fla. (R. E. L. Chancey, of Tampa, Fla., on the brief), for defendant in error.

Before WALKER, Circuit Judge, and GRUBB and JACK, District Judges.

WALKER, Circuit Judge. This was an action by the defendant in error, Commercial Credit Company, a Delaware corporation (herein referred to as the Credit Company), against the plaintiff in error, the Sponge Exchange Bank, a Florida banking corporation (herein referred to as the Bank), as the indorser of 13 promissory notes made to and indorsed by the United Divers' Supply Company (herein referred to as the Supply Company). The Bank pleaded, first, payment; and, second, a plea to the effect that it was never the owner of the notes sued on, and that its president indorsed them in its name solely

for the purpose of lending its credit to said notes, which was well known to the Credit Company when it acquired the same. The Bank assigns as errors sundry rulings made by giving and refusing instructions to the jury, including the action of the court in overruling the Bank's motion, made at the conclusion of the evidence, to direct a verdict in its favor.

The notes sued on were acquired by the Credit Company in the course of dealings which commenced in pursuance of the terms of the following letter of its vice president:

"April 5, 1916.

"Mr. A. M. Lowe, President, The Sponge Exchange Bank, Tarpon Springs, Fla.—Dear Sir: Mr. Macrenaris and Mr. Welge called upon us with reference to advancing on the accounts of the United Divers' Supply Co., representing advances for supplies, etc., made to the owners of various boats engaged in the sponge business. These accounts are of a character somewhat out of our regular line and some of our committee are disinclined to handle them for several reasons. It has been suggested that if we will furnish the money required to carry the accounts from the time the supplies are furnished until the catch is sold the transactions can be handled through your bank in a way to insure us against loss. We have expressed our willingness to advance the money under the following arrangement:

"The United Divers' Supply Co. to take notes from the various vessel owners for the amounts of their respective accounts, indorse the same, after which you will advance thereon 77 per cent., and in turn indorse them to us for a similar advance. Our charge will be on the face of the accounts at the same rate provided in our contract with the Sponge Divers' Association, namely, one-thirtieth of 1 per cent. a day on the face of the invoices, plus one-half of 1 per cent. on the amount of accounts assigned us: Provided, however, that this one-half of 1 per cent. will be refunded if said volume reaches $100,000 within a period of 12 months. Your own charge would be a matter for adjustment between you and the United Divers' Supply Co.

"It would be agreeable to us, should you prefer such an arrangement, that the amount of funds required be deposited by us in your bank, a surety bond to be given us guaranteeing deposits, you then to use the funds in making the required advances to the United Divers' Supply Co. upon the same basis of compensation as outlined above. If there is any other method that you prefer, which would afford us similar protection, we would be glad to receive your suggestion.

"Awaiting your further advices, we remain,

"Yours very truly,          Wm. H. Grimes, Vice President."

After the Credit Company had so acquired several notes given to the Supply Company and indorsed by it and the Bank, the latter not giving a surety bond under the option stated in a paragraph of the letter, the following written agreement was entered into:

"This agreement, entered into this 8th day of May, 1916, by and between the Sponge Exchange Bank of Tarpon Springs, Florida, party of the first part, and Commercial Credit Company, a Delaware corporation, its successors or assigns, designated as second party, witnesseth:

"That whereas, first party, in order to obtain funds necessary to assist the United Divers' Supply Company of Tarpon Springs, Florida, in conducting its operations, desires to sell to second party notes given to the United Divers' Supply Company by its various customers and indorsed to said first party by said United Divers' Supply Company:

"Now, therefore, in consideration of the premises, the parties hereby agree as follows:

"Second party will from time to time, during the continuance of this agreement, buy such notes belonging to first party as may be acceptable to

second party, and will pay therefor one hundred per cent. (100%) of the face of said notes, of which 77% shall be paid in cash upon acceptance thereof by second party, and the remaining 23%, less any deductions and plus any overpayments by the debtors, and less charges hereinafter mentioned to be paid to said first party immediately upon payment of any such note to second party: Provided that no payments of any such remainder shall be made so long as any note purchased hereunder is due and unpaid.

"The total compensation to be paid by first party, it is agreed shall be one-thirtieth of 1 per cent. of the face of said notes for each day from date of purchase by and until paid to second party, plus $5 per $1,000 only on the first $100,000 of notes purchased within any 12 successive months' period. Said $5 per $1,000 will be refunded to first party as soon as $100,000 or more of notes have been purchased hereunder within any 12 successive months' period.

"In witness whereof, first party has caused these presents to be executed this 8th day of May, 1916.

"[Signed]   Sponge Exch. Bank,                    [Seal]
                 "By A. M. Lowe, President.      [Seal]

"Attest:  R. W. Pinholster, Cashier.

"Accepted by Commercial Credit Company this 17th day of May, 1916.
                 "By Wm. H. Grimes, Vice President.    [Seal]
                 "By S. G. Rosson, Secy.-Treas."

The following resolution was adopted by the board of directors of the Bank at a regular meeting on May 2, 1916, a copy of which was sent by the Bank to the Credit Company:

"The president presented a proposition from the United Divers Supply Co. as follows: The United Divers' Supply Co. are to take notes from the captains or owners of the vessels for money and provisions advanced them. The United Divers' Supply Co. to indorse said notes to the Sponge Exchange Bank, for an advance of 77 per cent. of their face value, up to the amount not to exceed $30,000.00, and the bank to indorse them to the Commercial Credit Co. of Baltimore, who will reimburse them. The $30,-000.00 to be used by the United Divers' Supply Co. to pay all loans now outstanding and to discount bills. Said advances made by this bank to be covered by marine insurance. Every vessel is to settle its note at the end of the current trip, and the United Divers' Supply Co. is to make up any and all shortages that may arise from a poor trip.

"Moved by G. E. Noblit and seconded by Walter Topliff, that if the United Divers' Supply Co. signs an agreement covering all of these points and others that may be added before the final closing of the agreement, that the proposition be accepted. Motion carried."

The following written agreement was entered into between the Bank and the Supply Company on May 10, 1916, and duly signed:

"For the purpose of raising money for conducting their business, the United Divers' Supply Co. agrees to take notes for provisions and cash furnished the sponge boats which they operate, said notes to be signed by the actual owner of the vessel, if possible; if not by the owner, by the captain in charge of the vessel. Attached to each note shall be a bill of the merchandise and cash furnished the vessel, and insurance policy covering such merchandise and cash advance.

"It is further agreed that, when these boats come in and sell their catch, these notes shall be the first thing paid, regardless of any other account against the vessel. Should a vessel fail to bring in sufficient sponge on the trip to pay their notes, the United Divers' Supply Co. agrees to make up the shortage. It is understood and agreed that these notes must be paid each trip before any further advances will be made.

"In consideration of these notes and agreement, and 1 per cent. commission per annum on sum used the Sponge Exchange Bank agrees to take these notes, which shall bear the indorsement of the United Divers' Supply

Co., and indorse them to the Commercial Credit Co. of Baltimore, who will advance 77 per cent. of the face of the note. The Sponge Exchange Bank, however, will not indorse for a sum greater than $30,000.00 advance, and it must be understood that the Sponge Exchange Bank will not under any consideration make any further loans to the United Divers' Supply Co. above this indorsement, unless it is sufficiently covered by satisfactory collateral.

"It is also agreed that, upon obtaining this $30,000.00, the United Divers' Supply Co. will pay off all its obligations to the Sponge Exchange Bank, and all other obligations so far as it is possible to do so."

There was in evidence a written instrument, dated June 10, 1916, which was duly signed, and purported to be a contract between the Credit Company and the Supply Company and several individuals, who signed as guarantors of the latter Company. That instrument provided for the acquisition by the Credit Company from the Supply Company of such accounts receivable, notes, leases, mortgages, contracts, and choses in action as may be acceptable to the former, and for paying therefor in the same way as was provided for in the contract of May 8, 1916, between the Bank and the Credit Company. That instrument contained a provision authorizing the Supply Company to receive payments on paper acquired by the Bank under it. There was testimony having some tendency to prove that none of the notes sued on were acquired by the Credit Company under the last-mentioned instrument.

[1] Undisputed documentary evidence requires the conclusion that there was no material change in the character of the dealings by which the Credit Company acquired through the Bank notes made to the Supply Company after those dealings were commenced in pursuance of the Credit Company's above set out letter of April 5, 1916. The agreement of May 8, 1916, which was in force when the notes sued on were made and indorsed, made no change in the terms governing the transactions, except the immaterial one of referring to the dealings provided for as sales of notes. The nature of a transaction is not determined by the name the parties give it. The letter of April 5th proposed the making of advances by the Credit Company to the Supply Company, through the Bank as an intermediary, on notes given to the Supply Company, indorsed by it and the Bank, and calling for 23 per cent. more than the advances made on them. That it was contemplated that the Bank, except as to its liability as indorser undertaken to be incurred to enable the Supply Company to obtain advances it desired and which the Credit Company was willing to make, was to be a mere intermediary, is indicated by the suggestion in the letter that it might avoid even a very temporary outlay of its own funds by giving a surety bond to protect the Credit Company against loss of amounts deposited by it with the Bank in anticipation of the making of advances through the latter. The Bank was not approached as a prospective borrower.

The result of transactions in pursuance of the proposition would be the creation of interest-bearing debts separate and different in amounts from these evidenced by the notes indorsed and transferred. As a matter of law it would follow that the collection by the Credit Company of the amount called for by a note so acquired would not

entitle it to retain that amount if it exceeded the sum of the advance or advances with stipulated interest thereon. The acquisition by the Credit Company of a note in the manner provided for was essentially different from a purchase. That there was no sale follows from the fact that the indorsing payee was not divested of ownership. Neither the Bank nor the Credit Company became entitled as owner to the amount paid in satisfaction of a note. Upon payment of that amount the payee and first indorser was entitled to receive as owner so much of it as was not required to repay the amount advanced and the agreed compensation or interest for the use of that amount, including what was payable to the Bank for what it did. The payee remained none the less the beneficial owner of that excess, as a result of it being made subject to be applied in payment of advances made on other notes acquired in the same way by the indorsee.

[2] When by the terms of a transaction by which an indorsee acquires a note he is required to pay, or account to the indorser for, so much of what is collected on it as is in excess of an amount advanced and agreed interest thereon, the transaction is not a sale of the note, and the indorsee is not the buyer of it. If only one note had been acquired by the Credit Company in pursuance of the terms stated in its letter of April 5th, and in the written agreement between it and the Bank, and that note had been paid at maturity, the amount of the payment being more than the 77 per cent. advanced and the agreed charge therefor, the difference would have to be paid by the Credit Company to the Bank, and by the latter in turn to the Supply Company, after deducting the Bank's charge for what it did. If that had been the transaction presented, it hardly would have been contended that the Supply Company's relation to the note was other than that of owner of it, subject to a pledge of it to secure the advance obtained and charges therefor.

The succeeding transactions in pursuance of the continuing arrangement were of the same nature as the first one. The result of each of them was that the Credit Company acquired a note or notes, indorsed by the payee and the Bank, as security for the repayment of amounts advanced on those and other notes and interest or compensation for the use of such amounts. The above set out instruments are to be considered together as parts of one transaction. Under the arrangement made the Supply Company was enabled, by obtaining the Bank's indorsement of notes which the latter never really became the owner of, to get advancements from the Credit Company; the Bank being promptly reimbursed by the Credit Company for the quite temporary outlays made, or credits allowed, for the purpose of creating obligations in which it had no substantial beneficial interest, its real relation to the transaction being that of an accommodation indorser of notes made to the Supply Company and continued to be owned by the latter. Evidently it was not contemplated that the Bank was to receive anything by way of interest. Its small fixed charge was not measured by the time elapsing between the date of its payment to the Supply Company and the date of its reimbursement by the Credit Company. The amount of the charge indicates that it was intended to

cover the expenses of the service rendered in acting as intermediary between the borrower and the lender.

So far as the Bank was concerned the effect of the transactions was substantially the same as it would have been if the Bank, acting on the Credit Company's promise of prompt reimbursement, had cashed, or given the Supply Company credit for the amounts of, drafts drawn on the Credit Company by the Supply Company and indorsed by the Bank for 77 per cent. of the amount of accompanying notes representing debts to the Supply Company. The stipulated compensation for the use of the sums advanced amounted to substantially more than the interest allowed to be charged by the Florida law. In so far as any of the instruments evidencing the agreement of the parties use words fit for a contract of purchase they were mere shams and devices to cover loans of money at usurious rates of interest. Home Bond Co. v. McChesney, 239 U. S. 568, 36 Sup. Ct. 170, 60 L. Ed. 444; Commercial Security Co. v. Holcombe, 262 Fed. 657, —— C. C. A. ——, U. S. Circuit Court of Appeals, Fifth Circuit, present term.

[3] The above referred to written agreement between the Credit Company and the Supply Company provided for the former making 77 per cent. advances to be compensated for as provided in the other agreements set out. This being so, the question whether the notes sued on were acquired under that agreement is not material, except in so far as a provision of it authorizing collections by the Supply Company might have the effect of entitling the Bank, under its plea of payment, to the benefit of payments made to the Supply Company of amounts called for by notes sued on. The plea of payment need not be considered, if the evidence was such as to require a verdict in favor of the Bank on the issue raised by its other plea. If the latter plea was sustained by uncontroverted evidence, the result would be the same, whether the agreement referred to was or was not in force or applicable to the transactions in question.

[4, 5] The law under which the Bank exists does not permit it to lend its credit to paper which it does not own, and in which it has no beneficial interest. General Statutes of Florida, § 2707; Cottondale State Bank v. Oskamp Nolting Co., 64 Fla. 36, 59 South. 566, Ann. Cas. 1916D, 564. The Florida law on this subject, with notice of which parties dealing with the Bank are chargeable, is in conformity with the generally prevailing law governing banks. To permit banks to have and exercise the power of lending their credit for the sole benefit and advantage of others would be detrimental to the interests of depositors, stockholders, and the public generally. Commercial National Bank v. Pirie, 82 Fed. 799, 27 C. C. A. 171; Bowen v. Needles National Bank, 94 Fed. 925, 36 C. C. A. 553; Merchants' Bank of Valdosta v. Baird, 160 Fed. 642, 90 C. C. A. 338, 17 L. R. A. (N. S.) 526; Note Ann. Cas. 1916D, 554. The written agreements in pursuance of which the Bank made the indorsements sued on make it plain that it did so for the sole benefit of others, and not in the ordinary course of a banking business. It acquired the notes for the purpose of indorsing and promptly transmitting them to the Credit Company; the latter promptly remitting the identical amount of the Bank's temporary

outlay or credit. The mere form given to the transaction does not prevent it being in reality an advance by the Credit Company to the Supply Company on notes made to and owned by the latter, and indorsed by it and the Bank. The indorsements were not incidents of real purchases and sales of notes by the Bank.

The Bank's relation to the transactions was that of an indorser of notes which never really became, and were never intended to be, assets in which it was beneficially interested. The advances it made were not for itself, but for the Credit Company, which was to make immediate reimbursement and get all interest to accrue. The obvious purpose and necessary effect of having the notes in question pass through the Bank in the manner provided for were to make it liable on them, without it really acquiring any beneficial interest, but solely for the benefit of the Credit Company and the Supply Company. What the Bank did amounted to lending its credit to paper on which it could realize nothing. This is not permitted by the law under which the Bank exists. The conclusion is that the indorsements sued on were accommodation ones, and are not enforceable in favor of the Credit Company, which the uncontroverted evidence shows acquired the notes with knowledge of the Bank's real relation to them.

It follows that the court erred in overruling the Bank's motion that a verdict in its favor be directed. Because of that error the judgment is reversed.