## DUNN v. McCOY et al.
### No. 7286.

Circuit Court of Appeals, Third Circuit.
June 29, 1940.

Charles H. Weidner, of Reading, Pa., for appellant.

George B. Balmer, of Reading, Pa., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

We seem to be still picking up the pieces. A small state chartered bank in the suburbs (Shillington) of Reading, Pennsylvania, begins to feel the pinch of 1929 in 1932. To secure its statute prescribed cash it sells some of its assets (inferen-tially at least not otherwise marketable) to a pool comprising the clearing house (seven) banks of Reading. Title was taken in the name of one Snyder, secretary of that Association. This proved only a stop-gap and further help was indicated. So one of the all to frequent rescue parties of that era was organized. The stretcher bearers were the same clearing house banks with the addition of a trust company from another suburb of Reading, Wyomissing.

The terms and conditions of rescue are embodied in a formal agreement dated March 29, 1932 (Exhibit A). It provided inter alia for a fund of $100,000, to be furnished the Shillington Bank, to restore its vanished capital and surplus and impaired (to the extent of $38,000) deposits. This fund was furnished in eight equal instalments by the assisting banks and was by each of them placed to the credit of the distressed bank in their own institutions. This credit was evidenced by pass books for $12,500 each. In return for this credit, the Shillington Bank turned over 689 of its 1,000 shares to Mr. Snyder as trustee under an option agreement. These shares were all owned by the directors of the embarrassed bank and by another bank in the affected suburb. The agreement also gave the Trustee these significant powers. We quote:

"1. The 'Trustee' shall have power at any and all times during reasonable hours to make an examination, either by himself or/and such representatives, as he may designate in writing, of the affairs of the 'Beneficiary' and for this purpose 'Beneficiary' hereby covenants to lend all possible assistance and to disclose any and all information concerning the affairs of the 'Beneficiary' to enable the 'Trustee' to be fully informed in regards to all of the financial affairs of the 'Beneficiary'.

"2. The 'Trustee' shall have the right under the authority granted him by the 'Beneficiary' to at any time discuss the financial affairs of the institution with the Secretary of Banking provided he is acceptable to the said Secretary of Banking". Exhibit A, Article 5, R. pp. 50, 51.

So the Shillington Bank was allowed to remain open.

Events moved too fast for the members of this, as well as of other banking fraternities. All the banks concerned were closed at or about the time of the bank-

ing holiday. Two of them, at least, the litigants here, did not reopen. Three liquidating Trustees were appointed for the plaintiff Shillington Bank and a conservator and receiver successively for the defendant clearing house bank, the Farmers National Bank and Trust Company, a national bank.

The state bank has paid its depositors 83%, will pay them in full, and may have some money left over for its stockholders. The national bank, originally the big brother, was not so fortunate and has paid its depositors only 60% with no predictions as to the future. It seems to have been the experience that the sooner they fail the higher they pay. In other words, swim with the tide not against it. The clearing house banks exercised their option and now own the 689 shares of the old (it is being reorganized) Shillington Bank. These shares are, of course, assessable but, by the same token, are not going to be assessed when the assets of the bank indicate a surplus due stockholders.

The plaintiff-appellee, the Shillington Bank, received its dividends ($5,343.75) up to March 15, 1937. On that date another dividend of $1,187.50 was declared by the defendant-appellant, Farmers National Bank & Trust Company. This, it refused to pay and on this suit being brought therefore counterclaimed for the already paid dividends on the theory of a mistake of law. As we think there was no such mistake, we are not concerned with the unsatisfactory complications in the "payments under mistake of law" doctrine. The cases are collected inter alia in four interesting notes in four legal periodicals,[1] in notes 88 and 89 to 12 U.S.C.A. § 24. Compare 1 Zollman, Banks and Banking §§ 212, 231.

The question for our decision has been considerably litigated. The cases are not in accord. It may be stated in broad terms as follows. What is the power of cooperative banking action prompted by the common interest in preventing the impact upon public confidence in the banking group of a failure of a member of the group? It is conceded that legislative bodies do not seem to have foreseen the necessity for any such cooperative action. We must fall back then on the always difficult interpretation of words. The words here are "all such incidental powers as shall be necessary to carry on the business of banking", 12 U.S.C.A. § 24, 7 P.S. § 208,[2] and are simply a legislative recognition of the impracticability of complete prevision in the field of expressly delegated powers. A similar recognition has made work for the courts in a subdivision of constitutional law. The cooperative action fostered by the banking events of this and similar cases lies in the field and takes the form of a guaranty. This is so, actually if not technically, irrespective of the legal garments put on by the rescue party as they set out on their errand of mercy. A form so extreme as perhaps not to be a form at all would include donations, Evans v. Brunner, Mond & Co., Ltd., 1 Ch. 359.[3]

A general power to make guaranties is rarely included in the statutory list of general powers granted to banks, 1 Zollman, Banks and Banking §§ 212, 231, above cited. Pennsylvania at one time authorized banks to guarantee bonds secured by mortgages on real estate, 7 P. S. § 208. The experience seems to have been unfortunate for the grant was expressly repealed by the Act of April 22, 1937, 7 P.S. § 819—1021. In many states, however, the power to issue letters of credit forms an exception to this general rule. Typical statutes are: Ohio Gen. Code sec. 710-137 (page 1926); Oregon Code Ann. (1930) sec. 22-527 (6). Such letters are in essence only guaranties, 5 Zollman, Banks and Banking (1936) §

---

[1] Power of Banks to Guarantee the Liabilities of Other Banks, 46 Yale Law Journal 528 (note); Corporations—Ultra Vires: Contracts—Power of a Bank to Guarantee the Deposits of Another Bank, 50 Harvard Law Review 130; "Ultra Vires" Corporate Credit Transactions, 83 University of Pennsylvania Law Review 479, 485 (note); Banks and Banking—Validity of Agreement of One Trust Company to Indemnify Another for Assuming Liabilities of Insolvent Bank, 85 University of Pennsylvania Law Review 219.

[2] Cf. as to Pennsylvania, 7 P.S. § 819—313 (6).

[3] Analogy exists in allowance of donations for intangible benefits as necessary expenses on tax returns, American Rolling Mill Co. v. Commissioner, 6 Cir., 41 F.2d 314; contra, Helvering v. Evening Star Newspaper Co., 4 Cir., 78 F.2d 604, certiorari denied 296 U.S. 628, 56 S.Ct. 151, 80 L.Ed. 446.

5104; Finkelstein, Legal Aspects of Commercial Letters of Credit (1930) 32, 33, 38, 39; McCurdy, Commercial Letters of Credit, 35 Harvard Law Review 539. "The absence of an express grant of power, however, has not prevented the enforcement of guaranties which the courts would characterize as having been entered into by banks for the furtherance of their own rights or as an incident to the transaction of their own business.[4] Under the applications of this flexible rule, it is clear that in order to protect authorized loans, a bank may ordinarily guarantee to its debtors' other creditors that their pre-existing or subsequently created loans will be paid.[5] A bank may also guarantee the quality of its debtor's goods in order to induce a potential purchaser of those goods to assume the debt,[6] or warrant the quality of goods in order to realize on collateral security already obtained;[7] or guarantee payment of a note which is the obligation of another, if this is necessary to dispose of its own paper and securities;[8] and the guaranty of the liabilities of another bank, if accompanied by a receipt of assets, may be upheld as incidental to the exercise of the power either to purchase and discount paper and securities or to buy and sell coin and bullion."[9] On the other hand, banks are not permitted to guarantee the business accounts of their customers.[10]

There can be no doubt as to the impact on confidence, of which we spoke earlier. A closed bank is as surely followed by withdrawals from open banks as is the day by night.[11] This happens not only from apprehension but also from altruism —friends may have frozen funds. Should the depositors and stockholders fortunate enough to escape either the vis major of the financial world or the folly of those who practice its arts endanger their own security? An analogy to the flood, fire, and pestilence of the physical world seems more than persuasive because here there is an element of self-interest.[12] There the individual must yield to the community and accept his losses philosophically. So the bank owner and creditor must make some sacrifices at least.

The criteria governing the extent of that sacrifice come readily to mind. Is the guaranty bare, i. e. unsecured or is it in return for tangible benefit? Is that benefit proportionate to the risk of loss? Is the guarantee limited in amount? Does it include a minimization by management? Does it perpetuate a weak institution in an overbanked community? Does it entail, go beyond, the loss of the guaranty and endanger the solvency of the guarantor?

Searching for these criteria in the principal case, what do we find? There is no real tangible benefit because the value of the collateral shares depends on the outcome of the original risk. There is a provision for supervision and appellant's denial thereof moved us to quote it. The guarantee is exactly limited to the rather

---

[4] 4 Michie, Banks and Banking sec. 33; 7 Michie, Banks and Banking sec. 163.

[5] Allis-Chalmers Mfg. Co. v. Citizens' Bank & Trust Co., D.C., 3 F.2d 316; Norton Grocery Company v. People's National Bank, 151 Va. 195, 144 S.E. 501; Second National Bank v. U. S. Fidelity Co., 4 Cir., 266 F. 489; contra: Howard & Foster Co. v. Citizens' National Bank, 133 S.C. 202, 130 S.E. 758; First National Bank v. Monroe, 135 Ga. 614, 69 S.E. 1123, 32 L.R.A.,N.S., 550.

[6] Exchange Bank v. Hensley & Roland, Tex.Civ.App., 240 S.W. 679.

[7] Gotham National Bank v. Sharood Co., 2 Cir., 23 F.2d 567; Taylor v. Hemphill, Tex.Civ.App., 238 S.W. 986.

[8] International Harvester Co. v. State Bank of Upham, 38 N.D. 632, 166 N.W. 507; Collings v. Guarantee Trust Co., D.C., 10 F.Supp. 462; People's Bank v. Manufacturers' Bank, 101 U.S. 181, 25 L.Ed. 907.

[9] Schofield v. State National Bank, 8 Cir., 97 F. 282.

[10] Rice & Hutchins Atlanta Co. v. Commercial Nat. Bank, 18 Ga.App. 151, 88 S.E. 999; Healey & Son v. Stewardson Nat. Bank, 285 Ill.App. 290, 1 N.E. 2d 858; contra: Wasson v. American Can Co., 189 Ark. 354, 72 S.W.2d 241.

[11] Willis and Chapman, The Banking Situation, 367; Sprague, History of Crises Under The National Banking System, 45, 112, 142, 170, 314.

[12] American Print Works v. Lawrence, 21 N.J.L. 248; Hale v. Lawrence, 21 N.J.L. 714, 47 Am.Dec. 190; American Print Works v. Lawrence, 23 N.J.L. 590, 57 Am.Dec. 420; Keller v. City of Corpus Christi, 50 Tex. 614, 32 Am.Rep. 613; Bowditch v. City of Boston, 101 U. S. 16, 25 L.Ed. 980; Field v. City of Des Moines, 39 Iowa 575, 577, 28 Am. Rep. 46; Pamphlet, The Law of Necessity (Bisbee I. W. W. Deportation case, State of Arizona v. Wootton [32 Ariz. 203, 256 P. 1055]), published by Bureau of Information (Arizona), pp. 30-43.

**590**

negligible sum of $12,500. There is no evidence of how far that negligible sum affected the stability of an institution that afterwards did in fact fail. The record is also bare of testimony as to the banking posture in Reading and its environs and so the superfluity of the plaintiff and the consequent unwisdom of its continuance do not appear.

On that showing we uphold the contract and so align ourselves with those courts which deprecate the arguments of hindsight. It is perhaps significant that only those institutions whose custodial status requires judicial advice seem to seek to repudiate this type of contracts. Those who survive stick to their bargains and so give an intimation of the judgment of the banking world. We accept that judgment in the principal case.

We need hardly add our agreement to the view of appellant's counsel that the possibility of benefit to the Shillington Bank's other stockholders (outside the 689 shares pledged and finally bought by the defendant) is a bridge that should not be crossed until arrival thereat.

The judgment of the district court is affirmed.