GILBERTSON, Chief Justice.
[¶ 1.] On February 2, 2004, Northwestern Services Corporation (NSC) commenced an action in the South Dakota Third Judicial Circuit for breach of contract against Si-Tanka Huron University (Si-Tanka) and to enforce a guarantee by Wells Fargo Minnesota, N.A. (Wells Fargo). On June 2, 2005, NSC filed a motion for summary judgment against Wells Fargo. On October 21, 2005, Wells Fargo filed a cross-motion for summary judgment against NSC. A hearing was held on the motions on January 23, 2006. The circuit court issued its memorandum opinion on April 21, 2006, granting Wells Fargo’s motion and denying NSC’s. On May 2, 2006, the order on the motions was filed and judgment in favor of Wells Fargo was entered. We reverse and remand for proceedings consistent with this opinion.
FACTS AND PROCEDURE
[¶ 2.] The facts upon which our review of this appeal is based are not in dispute. In September 1999, Marquette Bank, N.A. (Marquette) issued a loan to Newco, L.L.C. (Newco) for the purchase of Huron University (the University), located in Huron, South Dakota. The amount of the loan was $3.6 million. Prior to the transaction, Newco owned the heating, ventilation and air-conditioning system (HVAC) installed at the University.
[¶ 3.] Contemporaneous with its purchase of the University, Newco negotiated a sale-lease-back agreement with NSC for the HVAC. The terms of the agreement were memorialized in the Facility Management Contract, dated September 1, 1999(FMC). In addition to NSC and New-co, Marquette was also a signatory to the contract.
[¶ 4.] The terms of the FMC provided that NSC would pay $250,000.00 for the HVAC. Newco agreed to lease back the HVAC from NSC at a stated monthly installment. The installment included not only the cost of the equipment lease, but also provided for maintenance and the cost of natural gas to be supplied by NSC. In addition, NSC at its discretion was permitted to upgrade the HVAC at a cost of up to an additional $250,000.00. The term of the lease was fifteen years. At the end of the term, Newco could purchase the original HVAC for $1.00 and any upgrade equipment at its retail price less accumulated straight-line depreciation. In anticipation of the HVAC transaction, on August 11, 1999, Marquette’s credit committee approved the loan to Newco with the infusion of the $250,000.00 purchase funds from NSC. NSC paid the $250,000.00 for the purchase of the HVAC from Newco, directly to Marquette. Marquette applied the funds to pay down Newco’s loan.
[¶ 5.] The FMC also included a “Buyout Provision” that would trigger in the event Newco defaulted on the lease or became subject to lender foreclosure. The provision stated that Marquette would purchase the HVAC from NSC if the buyout was triggered. Marquette’s purchase price *627 would be calculated by taking the retail price of the original equipment, valued at $250,000.00, and the retail value of any upgrade equipment, less the accumulated straight-line depreciation of each component. Since it was agreed that upgrades would not exceed $250,000.00, Marquette’s purchase price could not exceed $500,000.00.[1] Marquette’s loan-to-value (LTV) analysis contemplated a maximum LTV ratio of 66.5% based on the market value of the University assets less Marquette’s maximum buyout purchase price of $500,000.00. Marquette’s loan approval documents included a discussion of the risk minimizing benefits of the HVAC transaction for its loan to Newco weighed against Marquette’s maximum exposure of $500,000.00, in the event the HVAC buyout provisions were triggered.
[¶ 6.] In April 2001, the Cheyenne River Sioux Tribe purchased the University from Newco and changed its name to Big Foot (Si-Tanka) College (herein collectively referred to together with Si-Tanka Huron University as “Si-Tanka”).[2] On April 26, 2001, Marquette and Si-Tanka executed a loan agreement in the principal amount of $3.3 million for the purchase. This agreement expressly provided that Si-Tanka would “assume the rights, duties and obligations owed to [NSC] ... by Newco ... pursuant to the terms of the [FMC].” On that same day, NSC, Si-Tanka, Newco, Marquette and the United States Department of Agriculture[3] executed a document entitled “Consent to Assume” (the Consent). The Consent included NSC’s consent to Si-Tanka’s assumption of the terms of the FMC. The Consent also restated the continuing obligations of the parties under the FMC as well as “their successors and assigns.”
[¶ 7.] After making several monthly installment payments as required under the FMC, Si-Tanka discontinued making payments in October 2001. As required by the FMC, on January 14, 2003, NSC sent Si-Tanka notice of default with 30 days to cure. During the intervening time, Marquette was acquired by Wells Fargo.[4] When Si-Tanka failed to cure, NSC sent notice to Wells Fargo on February 14, 2003, of its intent to exercise its option to invoke the buyout provisions of the FMC, thus compelling Wells Fargo to purchase the HVAC. NSC calculated the purchase price, based on the value of the HVAC and upgrade equipment less accumulated strait-line depreciation, to be $450,000.00. Under the terms of the FMC, Wells Fargo had six months to satisfy its purchase obligations. Having failed to do so, NSC initiated an action in the South Dakota Third Judicial Circuit against Wells Fargo on February 2, 2004, alleging breach of a guarantee for failure to perform its purchase obligations under the FMC. After NSC and Wells Fargo filed cross-motions for summary judgment, the circuit court entered its order on the motions and judgment in favor of Wells Fargo on May 2, 2006. NSC appeals raising the following issue:
Whether Wells Fargo’s obligation, to purchase the HVAC when Si-Tanka de *628 faulted on its lease obligations under the FMC, was an enforceable guarantee.
STANDARD OF REVIEW
Under our familiar standard of review in summary judgment cases, we decide only whether genuine issues of material fact exist and whether the law was correctly applied. If any legal basis exists to support the trial court’s ruling, we will affirm. “With the material facts undisputed, our review is limited to determining whether the trial court correctly applied the law.” Kobbeman v. Oleson, 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635.
Schulte v. Progressive Northern Ins. Co., 2005 SD 75, ¶ 5, 699 N.W.2d 437, 438 (internal citations omitted).
ANALYSIS AND DECISION
[¶ 8.] Whether Wells Fargo’s obligation, to purchase the HVAC when Si-Tanka defaulted on its lease obligations under the FMC, was an enforceable guarantee.
[¶ 9.] There is no dispute as to the fact that at all times relevant both Marquette and Wells Fargo were nationally chartered banks. Wells Fargo argues that as national banks, neither Marquette nor Wells Fargo was statutorily authorized to guarantee the obligations of the FMC lessee. Wells Fargo contends that the buyout provision of the FMC, obligating it to purchase the HVAC in the event of lessee default, constituted a guarantee of a third party obligation — here originally that of Newco whose lease obligations were assumed by Si-Tanka. As such, Wells Fargo avers that Marquette’s agreement to be obligated under the buyout provision, subsequently assumed by Wells Fargo when it acquired Marquette, is ultra vires and thus unenforceable.

The General Rule

[¶ 10.] We have observed that national banks derive their authority to conduct business from 12 U.S.C. § 24. Western Petroleum Co. v. First Bank Aberdeen (N.A.), 367 N.W.2d 773, 777 (S.D.1985). The authority to guarantee the debts of another is not provided within this statute. Id. “It is therefore generally held that ‘a national bank cannot lend 'its credit by guaranteeing the debt of another solely for his benefit.’ ” Id. at 777-78 (quoting 9 CJS Banks and Banking § 661, at 1214 (1938)) (additional citations omitted). Many venerable cases have recognized this principle. See Federal Intermediate Credit Bank of Omaha v. L’Herisson, 33 F.2d 841, 847 (8th Cir.1929) (citations omitted) (noting that a national bank does not have the statutory authority, even when solvent, to lend its credit for the benefit of another); Merchants’ Bank of Valdosta v. Baird, 160 F. 642, 646 (8th Cir.1908) (holding that a guarantee by a national bank, to honor checks of its depositor within a given period and without regard to amount, was an unenforceable loan of the bank’s credit where the bank had no interest in the obligations created therein by the depositor); Commercial Nat’l Bank v. Pirie, 82 F. 799, 801-02 (8th Cir.1897) (recognizing that the federal law authorizing the organization of national banks confers upon them no authority to guarantee the payment of debts contracted by a third person for his benefit and that acts of this nature are necessarily ultra vires); Bowen v. Needles Nat’l Bank, 94 F. 925, 931 (9th Cir.1899) (holding ultra vires a national bank’s guarantee to pay all checks of a third person, although such person had no funds on deposit); Thilmany v. Iowa Paper-Bag Co., 108 Iowa 333, 79 N.W. 68, 69 (1899) (holding that a national bank’s guarantee for the fulfillment of the obligation of another is not authorized unless such guarantee is made in connection with the *629 transfer of a chose in action or other property belonging to the bank); First Nat’l Bank v. American Nat’l Bank, 173 Mo. 153, 72 S.W. 1059, 1061 (1903) (disagreed with on other grounds) (holding a national bank has no power to bind itself that a draft drawn on its customer will be paid, and when sued on such a contract, it can plead ultra vires).

Exceptions to the General Rule

[¶ 11.] While it is clear that a national bank may not merely lend its credit or guarantee the obligations of another solely for the other’s benefit, there are circumstances in which a bank may issue a guarantee. In People’s Bank v. National Bank, 101 U.S. 181, 181, 25 L.Ed. 907 (1879), a national bank’s debtor made a note payable to himself and then endorsed it to the order of a third party. The debtor delivered the note to the bank, which then negotiated it to the third party with an additional guarantor’s endorsement. The bank then applied the proceeds to credit the account of the debtor. The United States Supreme Court held that such a contract of guarantee is within the implied statutory powers of a national bank and thus the bank had issued an enforceable guarantee. Id. at 183, 101 U.S. 181, 25 L.Ed. 907. See also Cochran v. United States, 157 U.S. 286, 297, 15 S.Ct. 628, 632, 39 L.Ed. 704 (1895) (citing People’s Bank, supra) (restating the principle that national banks have the implied statutory authority to make contracts of guarantee).
[¶ 12.] The court in Dunn v. McCoy, 113 F.2d 587 (3d Cir.1940) addressed the absence of an express statutory provision granting national banks the authority to make contracts of guarantee. The court noted that such absence “has not prevented the enforcement of guaranties which the courts would characterize as having been entered into by banks for the furtherance of their own rights or as an incident to the transaction of their own business.” Id. at 589 (citations omitted). Recognizing the justification for enforcement under such circumstances as a “flexible rule,” the court further observed, “it is clear that in order to protect authorized loans, a bank may ordinarily guarantee to its debtors’ other creditors that their preexisting or subsequently created loans will be paid.” Id. (citations omitted).
[¶ 13.] The federal regulations governing banks and banking are more explicit in their grant of guarantor authority to national banks. 12 C.F.R. § 7.1017 provides:
A national bank may lend its credit, bind itself as a surety to indemnify another, or otherwise become a guarantor ... if: (a) The bank has a substantial interest in the performance of the transaction involved ...
(Emphasis added).
[¶ 14.] The Office of the Comptroller of the Currency (OCC) has issued several interpretive letters addressing the issue of what constitutes a substantial interest. The United States Supreme Court has noted that deferential treatment is to be afforded the regulatory interpretations of government agencies. NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-57, 115 S.Ct. 810, 813, 130 L.Ed.2d 740 (1995) (citations omitted). Charged with enforcement of federal banking laws, the OCC is to be afforded deference with respect to regulatory interpretations. Id. (citations omitted). This doctrine was recently confirmed in Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) wherein the Court held:
It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in *630 statutes that they are charged with administering.
As we observed only last Term, that practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws. “The Comptroller of the Currency,” we said, “is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberate conclusions as to the means of these laws.” NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-57, 115 S.Ct. 810, 813, 130 L.Ed.2d 740 (1995).
Id. at 738, 517 U.S. 735, 116 S.Ct. at 1733, 135 L.Ed.2d 25 (internal citation omitted).
[¶ 15.] Mindful of this deferential standard of interpretation, we note that the OCC, interpreting 12 C.F.R. § 7.1017, has concluded:
A “substantial interest” exists if the guarantee provided by the bank is incidental to an authorized activity. To put it another way, the nexus between the bank permissible transaction and the guarantee provides the substantial interest for the bank.
OCC Interp. Ltr. 1022 (Feb. 15, 2005), 2005 WL 1939709 (citations omitted) (emphasis added); OCC Interp. Ltr. 1014 (Jan. 10, 2005), 2005 WL 1939716 (citations omitted); OCC Interp. Ltr. 929 (Feb. 11, 2002), 2002 WL 432437 (citations omitted); OCC Interp. Ltr. (June 4, 1993), 1993 WL 740922 (citations omitted).
[¶ 16.] In Arnold Tours, Inc. v. Camp, 472 F.2d 427 (1st Cir.1972), it was held “that a national bank’s activity is authorized as an incidental power, ‘necessary to carry on the business of banking,’ within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank’s established activities pursuant to its express powers under the National Bank Act.” Id. at 433 (quoting 12 U.S.C. § 24, (Seventh)) (emphasis added).[5] The OCC has subsequently recognized the Austin court’s interpretation of “incidental power.” OCC Interp. Ltr. 1014 (Jan. 10, 2005), 2005 WL 1939716; OCC Interp. Ltr. No. 742 (Aug. 19, 1996); OCC Interp. Ltr. No. 737 (Aug. 19, 1996). Similarly, this Court has noted that a national bank’s guarantee of the debt of another is permissible “if done in the ordinary course of banking or if ‘it owns or has an interest in the obligation guaranteed.’ ” Western Petroleum Co., 367 N.W.2d at 778 (quoting 7 Michie, Banks and Banking § 163, at 279-80 (1980)).[6]

*631
The FMC “Buyout Provisions”

[¶ 17.] Wells Fargo argues that it received nothing from NSC to validate its guarantee to purchase the HVAC in the event of lessee default. It further argues that the guarantee is invalid because the payment of the HVAC purchase price from NSC to the bank was merely inherent to its normal lender-borrower relationship with Si-Tanka. We disagree.
[¶ 18.] That NSC’s payment of the HVAC purchase price to the bank was inherent to a normal lender-borrower relationship of Wells Fargo alone establishes the validity of the guarantee. Loaning money for the purchase of the University was an authorized activity for Wells Fargo. NSC’s $250,000.00 payment directly to the bank that was applied as credit against the loan balance was convenient and useful in connection with Wells Fargo’s performance of its authorized activity of lending money. Wells Fargo’s guarantee that it would purchase the HVAC from NSC in the event of lessee default was an inducement for NSC to enter into the FMC, hence giving rise to the payment. As such, the guarantee was incidental to Wells Fargo’s authorized activity of lending money for the purchase of the University. Therefore, Wells Fargo had a substantial interest in making the guarantee.
[¶ 19.] Wells Fargo similarly had a substantial interest in making the guarantee from the standpoint that the building infrastructure collateral for the University loan had more value with the guarantee than without. Had NSC entered into the FMC absent Wells Fargo’s guarantee, NSC would have been entitled to repossess the HVAC when Si-Tanka defaulted. Wells Fargo attempts to claim that the guarantee added no value to the loan collateral by evincing its perfected security interest in all University property. However, Wells Fargo overlooks the fact that it was anything but assured to garner sufficient proceeds on a foreclosure sale to cover the outstanding loan balance. Absent a functioning HVAC, the likelihood of a full recovery at foreclosure would have been even more remote. Since the guarantee did add value to the collateral it was likewise convenient and useful to the loan and thus incidental to that authorized activity. Consequently, Wells Fargo also had a substantial -interest in making the guarantee from this perspective.
[¶'20.] Although the enforceability of Wells Fargo’s guarantee is evident from this analysis, we also deem it necessary to address Wells Fargo’s claim that it received nothing from the HVAC transaction. First and obviously, the bank received cash in hand from NSC that it applied against the loan balance thereby reducing its exposure and increasing its equity in the loan by $250,000.00. Second, as discussed, the bank benefited from the value added to the collateral by the guarantee. Third, Wells Fargo benefited from NSC’s additional expenditures made in upgrading the HVAC.
*632 [¶ 21.] The second benefit is not quantifiable. However, the first and the third are completely quantifiable as evident from the “buyout provisions” of the FMC. That Wells Fargo and its predecessor, Marquette, were cognizant of these benefits is obvious from the credit committee’s August 11, 1999 loan approval that made reference to the anticipated $250,000.00 payment from NSC. This cognizance is further demonstrated by the loan approval documents that show, as part of the loan approval process, Wells Fargo considered the weight of the maximum potential buyout price against the risk minimizing benefits of the HVAC transaction.
[¶ 22.] Wells Fargo received $250,000.00 in cash, based on the retail price of the HVAC, thus improving its equity position in the loan. NSC invested an additional $250,000.00 that enhanced the value of the HVAC to Wells Fargo on buyout. Less straight-line depreciation, Wells Fargo realized a quantifiable benefit of $450,000.00 and its guarantee is enforceable to that extent.
[¶ 23.] We reverse and remand for further proceedings consistent with this opinion.
[¶ 24.] SABERS and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.
[¶ 25.] ZINTER, Justice, concurs in result.
[¶ 26.] MILLER, Retired Justice, sitting for KONENKAMP, Justice, disqualified.

. In fact NSC did invest $250,000.00 in upgrades shortly after it purchased the HVAC.

. “Bigfoot (Si-Tanka) College” is a non-profit corporation registered with the South Dakota Secretary of State and established by the Cheyenne River Sioux Tribe to operate the University under the name Si-Tanka Huron University.

. Si-Tanka received an additional $3.3 million loan, for the purchase of the University, from the United States Department of Agriculture, Rural Housing Service.

. Wells Fargo acquired Marquette in February 2002.

. We also take note that subsequent to the First Circuit Court of Appeals decision in Arnold Tours Inc., the United States Supreme Court expanded the scope of that decision by holding that the “business of banking” is not limited to the enumerated powers of 12 U.S.C. § 24 (Seventh), but that the Comptroller of the Currency has, within reasonable bounds, the discretion to authorize activities beyond those specifically enumerated. NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258, 115 S.Ct. 810, 814, 130 L.Ed.2d 740 n. 2 (1995).

. Our decision in Western Petroleum Co., 367 N.W.2d 773 preceded 12 C.F.R. § 7.1017 and the recent OCC Interpretive Letters. Although the language we used in Western Petroleum Co., is not technically the same as the "substantial interest” language utilized in 12 C.F.R. § 7.1017, as interpreted by the OCC, it does nonetheless recognize the same principle.
In noting that a bank has to be more than interested in the success of its debtor before it can issue an enforceable guarantee of its debtor’s obligations, id. at 779 (citing Rice & Hutchins Atlanta Co. v. Commercial Nat'l Bank, 18 Ga.App. 151, 88 S.E. 999, 1000 (1916)), we held that a national bank’s guarantee that its customer would pay vendor *631 invoices was not enforceable because the bank did not have an interest in and was not benefited by the vendor goods. Id. Specifically, the would-be guarantor received no consideration for its letter of guarantee; no property was transferred to it; no security interest was created and no direct pecuniary interest arose in it. Id. To put it another way, in Western Petroleum Co., there was no nexus between the bank-permissible transaction (the borrower-lender relationship between the bank and its customer) and the guarantee of the customer's agreement to pay vendor invoices. See OCC Interpretive Letters supra. In reaffirming the continued applicability of our decision in Western Petroleum Co., we hereby for the sake of consistency adopt the "substantial interest" language of 12 C.F.R. § 7.1017, as interpreted by the OCC, as the standard by which the enforceability of national bank guarantees are determined.